Patricia **BRAGG**, et al., Plaintiffs,

v.

Dana **ROBERTSON**, Colonel, District Engineer, United States Army Corps of Engineers, Huntington Division, et al., Defendants.

No. CivA 2:98–0636.

United States District Court, S.D. West Virginia, Charleston Division.

June 17, 1999.

654

Joseph M. Lovett, Mountain State Justice, Charleston, WV, James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, for Patricia Bragg, James W. Weekley, Sibby R. Weekley, plaintiffs.

Patrick C. McGinley, Morgantown, WV, James M. Hecker, Trial Lawyers for Public Justice, Washington, DC, Suzanne M. Weise, Morgantown, WV, for The West Virginia Highlands Conservancy, Harry M. Hatfield, Carlos Gore, Linda Gore, Cheryl Price, Jerry Methena, plaintiffs.

Michael L. Keller, Assistant U.S. Attorney, Rebecca A. Betts, United States Attorney, Charleston, WV, Lois J. Schiffer, Asst. Atty. Gen., Steven E. Rusak, U.S. Department of Justice, Environment & Natural Resources Div., Environmental Defense Section, Washington, DC, Ruth Ann Storey, U.S. Department of Justice, Environment & Natural Resources Div., General Litigation Section, Washington, DC, for Dana Robertson, Joe N. Ballard, Michael D. Gheen, defendants.

Thomas L. Clarke, William E. Adams, Jr., Craig B. Giffin, West Virginia Division of Environmental Protection, Office of Legal Services, Charleston, WV, Russell M. Hunter, West Virginia Division of Environmental Protection, Office of Mining & Reclamation, Nitro, WV, Benjamin L. Bailey, Brian A. Glasser, Bailey & Glasser LLP, Charleston, WV, for Michael Miano, defendant.

Roger A. Wolfe, Robert G. McLusky, James R. Snyder, Jackson & Kelly, Charleston, WV, for Hobet Mining, Inc., Catenary Coal Co., Mingo–Logan Coal Co., intervenor–defendants.

W. Warren Upton, M. Shane Harvey, Terry R. Sammons, Jackson & Kelly, Charleston, WV, for The West Virginia Mining and Reclamation Association, West Virginia Coal Ass'n, intervenor–defendants.

W. Henry Lawrence, IV, Robert D. Pollitt, Richard L. Lewis, Richard N. Farmer, Steptoe & Johnson, Charleston, WV, for Western Pocahontas Properties Limited Partnership, National Council of Coal Lessors, intervenor–defendants.

Grant Crandall, James M. Haviland, George P. Surmaitis, Crandall, Pyles, Haviland & Turner, Charleston, WV, for International Union, United Mine Workers of America, intervenor–defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending are (1) Plaintiffs' motion to dismiss all claims against the Federal Defendants[1] with prejudice, pursuant to *Rule*

---

1. As it has done previously, the Court uses the term "Federal Defendants" to refer to Dana

Robertson, Colonel, District Engineer; Joe N. Ballard, Lieutenant General, Chief of Engi-

41(a)(2), *Federal Rules of Civil Procedure,* in *Counts* 11, 12 and 13 of the Amended Complaint; (2) Plaintiffs' revised motion to dismiss their claims against the Federal Defendants, superseding and supplementing Plaintiffs' earlier motion;[2] (3) Plaintiffs' motion for leave to file a Second Amended Complaint; and (4) Hobet's motion to modify or clarify the scope of the Preliminary Injunction Order of March 3, 1999.

Plaintiffs and Federal Defendants[3] have filed joint memoranda in support of a proposed Settlement Agreement, which underlies the motions to dismiss. The Associations[4] have filed a memorandum opposing the dismissal, arguing the Settlement Agreement is flawed. Defendant Miano has filed a "Memorandum of Comment on the proposed Settlement Agreement."

The matters are ripe for review.

## I. BACKGROUND ·

### A. Factual Background

On December 23, 1998 Plaintiffs, Federal Defendants and Miano executed a Settlement Agreement that purports to resolve all claims against Federal Defendants for their alleged past failures to carry out statutory duties under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1344 *et seq.,* and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* The Settlement Agreement specifically excepted and allowed Plaintiffs to challenge the Spruce Fork mining permit process by filing an amended complaint. Similarly, Plaintiffs may challenge any future action[5] by the Army Corps of Engineers ("Corps") authorizing valley fills in waters of the United States under CWA section 404.[6]

The Settlement Agreement has two primary thrusts—the long-term approach and

neers and Commander; and Michael D. Gheen, Chief of the Regulatory Branch, Operations and Readiness Division, all of the United States Army Corps of Engineers.

**2.** From the denomination of their "Joint Memorandum in Support of the Settlement Agreement and Motion for Voluntary Dismissal," it might be thought Plaintiffs and Federal Defendants had submitted another motion to dismiss. However, this is not so. The first paragraph of their memorandum reveals the "Motion for Voluntary Dismissal" referred to is the earlier submitted one.

Pending also are (1) Plaintiffs' motion for summary judgment, declaratory judgment, and permanent injunction on *Count* 12 and (2) Plaintiffs' motion for leave to file a Second Amended Complaint. Upon agreement of counsel at the January 7, 1999 status conference, these motions were held in abeyance pending the resolution of the motions for voluntary dismissal. Nonetheless, because disposition of the motions to dismiss Federal Defendants is related closely to the changes sought in the complaint, the Court addresses the motion for leave to file a Second Amended Complaint in this Memorandum Opinion and Order.

The Court **DENIES** as moot Plaintiffs' motion for summary judgment, declaratory judgment and permanent injunction on *Count* 12.

At the close of the briefing for the motions to dismiss, the Associations filed a letter-form motion requesting a status conference. The

Court **DENIES** the letter-form motion as moot.

**3.** For purposes of this Memorandum Opinion and Order, the Court refers to Plaintiffs and Federal Defendants collectively as "Proponents."

**4.** The term "the Associations" denotes Intervenors West Virginia Mining and Reclamation Association and West Virginia Coal Association.

**5.** Plaintiffs, however, surrendered their right to challenge such authorizations with the argument that mining spoil is not fill material under 33 C.F.R. § 323.2(e). *Settlement Agreement* at 8.

**6.** Because several permits are necessary before a company can begin mountaintop removal mining operations, the Court briefly outlines the relevant permits and the authorities issuing them. Under the Surface Mining Control and Reclamation Act ("SMCRA"), "[s]urface mining operations must comply with the environmental protection performance standards established by SMCRA and refined in its implementing regulations." 5 Am.L. of Mining § 172.05[1]. The permit applicant must receive a SMCRA permit from the regulatory authority which, in this state, is the DEP.

A mining company must also seek permits in order to comply with the Clean Water Act.

the interim approach. First, the Environmental Protection Agency ("EPA"), the Corps, the Office of Surface Mining ("OSM"), and the Fish and Wildlife Service ("FWS"),[7] as well as the West Virginia Department of Environmental Protection ("WVDEP"), agreed to

> enter into an agreement to prepare an Environmental Impact Statement ("EIS") on a proposal to consider developing agency policies, guidance, and coordinated agency decision-making processes to minimize, to the maximum extent practicable, the adverse environmental effects to waters of the United States and to fish and wildlife resources affected by mountaintop mining operations, and to environmental resources that could be affected by the size and location of excess spoil disposal sites in valley fills. The parties intend that the EIS will be completed no later than 24 months after the Effective Date of this Settlement Agreement.

*Settlement Agreement* at 3. As a part of this, the Federal Agencies agreed to allow Plaintiffs "reasonable opportunities" to meet and "inform the development of the scoping document for the EIS consistent with the provisions of NEPA." *Id.* Also, the Federal Agencies promised to attempt retaining Plaintiffs' expert John Morgan, a mining engineer, and Bruce Wallace, a biologist, or persons similarly qualified, who are mutually acceptable to the parties, as

consultants "to assist the agencies in preparing the EIS." *Id.* at 4. Plaintiffs may also nominate, and the Federal Agencies will attempt to retain, a third consultant mutually acceptable to the parties. *Id.*

Second, the Settlement Agreement provided an interim approach.

> Prior to the completion of the EIS process and issuance of any record(s) of decision, any application for mountaintop mining operations in the State of West Virginia that would result in more than minimal adverse effects in waters of the United States will require an individual Corps permit under CWA section 404 for all overburden and other fill material (hereafter "fill") in waters of the United States.

*Id.* at 4–5. Any application for West Virginia mountaintop mining operations[8] "that proposes to discharge fill in waters of the United States draining a watershed of 250 acres or more shall be considered to have more than minimal adverse effects in waters of the United States and require an individual CWA section 404 permit." *Id.* at 5. The Corps and EPA will determine the number of watersheds to be affected by the proposed discharge to inform the Corps' determination of whether the cumulative adverse impact of a particular mining operation is minimal. *Id.*

Similarly, if the Corps determines a discharge into waters draining a watershed of

Under Section 401 of the CWA, the permit applicant must "obtain a certification from the state in which the proposed discharge is located that the discharge will comply with any applicable water quality standards." 5 Am.L. of Mining § 169.02[2][a][i]. Section 402 "makes it unlawful to discharge any pollutant from a point source [within the mine operation] to waters of the United States without an NPDES [National Pollutant Discharge Elimination System] permit." *Id.*

Under Section 404, the applicant must receive a permit from the Corps "for the discharge of dredged or fill material into the navigable waters," 33 U.S.C. § 1344(a), which are all "waters of the United States." *Id.* § 1362(7). An applicant may seek a general Section 404 permit under the Nationwide Permit ("NWP") program, if the mining "will

cause only minimal adverse effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 5 Am.L. of Mining § 169.02[3][b][iii][A]. For surface coal mining, the relevant Nationwide Permit is generally NWP 21. Alternatively, if the mining will not qualify under the NWP program, the applicant may seek an individual section 404 permit.

7. The Settlement Agreement referred to these parties collectively as "the Federal Agencies."

8. Mountaintop mining operations are defined as those that result in "excess spoil disposal sites in valley fills" in West Virginia. *Settlement Agreement* at 3.

less than 250 acres would cause more than minimal adverse environmental effects, the Corps will also require the applicant to seek an individual 404 permit. *Id.* Also, if the Corps determines a discharge "may affect an endangered or threatened species, the Corps will consult with the FWS." *Id.*

Furthermore, the Agreement called for "an inter-agency coordination process ... to ensure compliance with all applicable federal and state laws and guidance, improve the permit process, and minimize any adverse environmental effects associated with excess spoil created by mountaintop mining operations in West Virginia." *Id.* at 6. The goal of this process "is coordinated permit decisions that minimize adverse environmental effects." *Id.* A Memorandum of Understanding ("MOU"), entered into by the EPA, the Corps,[9] OSM, FWS and WVDEP, will govern the process and apply "to all such pending and future permits ... until this MOU is amended or rescinded." *Id.* at 7.

The proposed inter-agency coordination process commences when a company or organization files a "permit application for surface coal mining and reclamation operation that would result in a discharge into waters of the United States requiring a CWA permit." *Id.* at 6. When such an application is submitted, WVDEP will give notice of the application to the agencies who signed the MOU. If an individual 404 permit will be required, the signatory agencies will begin "a process of consultation and coordinated evaluation of the proposed individual permits." *Id.* The process will conclude in the issuance or denial of the Corps' CWA section 404 permit,

WVDEP's CWA section 401 certification, WVDEP's CWA section 402 permit ("NPDES permit"), and WVDEP's permit to engage in surface mining and reclamation operations.

Moreover, the Corps agreed to give Plaintiffs actual notice of all such applications for individual 404 permits, along with a copy of the application, free of charge, and a reasonable opportunity to comment on each application.

If disagreements arise over the interpretation or performance of the Settlement Agreement, the dissatisfied party will give written notice of the dispute and request negotiations. *Id.* at 11. If, after meeting to resolve the dispute, the parties cannot reach an agreement within 60 days, "then Plaintiffs' sole remedy is to refile the litigation. The Federal Defendants do not waive or limit any defense relating to such litigation. The parties agree that contempt of court is not an available remedy under this Settlement Agreement."[10] *Id.*

On January 7, 1999 the Court held a status conference exploring the scope and effect of Plaintiffs' motion to dismiss and the underlying Settlement Agreement. Pursuant to the Court's January 8, 1999 Order, the parties submitted briefs supporting or opposing Plaintiffs' motion.[11]

## B. Procedural Posture

Plaintiffs first moved to dismiss *Counts* 11, 12 and 13 against Federal Defendants. Shortly thereafter, Plaintiffs filed a revised motion to dismiss, stating it superseded the previous motion, which sought to dismiss *Count* 12 entirely and *Counts* 11 and 13 only to the extent they challenged

9. The Settlement Agreement also calls for the EPA to "endeavor to fund or provide a position in the Corps' Huntington District to provide the Corps with technical assistance in making CWA section 404 authorization decisions for valley fills in waters of the United States." *Id.* at 7.

10. In the Settlement Agreement Federal Defendants also agreed to pay Plaintiffs' reasonable attorneys' fees and expenses. *Id.* at 9.

11. WVDEP filed a memorandum "of comment" on the Agreement, which neither supports nor opposes the Agreement explicitly. The text of the memorandum reveals WVDEP supports the Agreement. The Court declines to endorse WVDEP's "comments" regarding the Agreement and addresses WVDEP's arguments only insofar as the agency seeks court action.

Corps' authorizations issued on or before December 23, 1998. Again, shortly after, Plaintiffs moved for leave to file a Second Amended Complaint to delete *Counts* 11, 12 and 13 entirely and to add *Counts* 16 and 17 against Federal Defendants challenging the authorizations associated with the Spruce Fork permit, the subject of the Preliminary Injunction hearings.

■ Upon review, it appears Plaintiffs seek a single destination, albeit through somewhat incompatible means. For instance, on its face *Rule* 41(a)(2) is an appropriate mechanism only when a plaintiff seeks to dismiss an entire action as against a defendant. To dismiss only some counts against Federal Defendants, Plaintiffs properly should move to amend their First Amended Complaint under *Rule* 15(a). *See* 8 *Moore's Federal Practice* § 41.21[1] (3rd ed.1997); 9 Wright & Miller, *Federal Practice and Procedure* § 2362 (1995).

The Court believes the matters may be addressed by recasting the motions according to the relief sought. The Court first addresses the motions to dismiss *Counts* 11, 12 and 13 under *Rule* 41(a)(2), *Federal Rules of Civil Procedure.* The Court next reviews under Rule 15(a) the motion to amend by adding new counts.

In so doing, the Court recognizes its approach may be somewhat technical, because "[i]n many instances the procedure for, and effect of, an amendment will be the same as a voluntary dismissal because of the similarities between the governing rules." 8 *Moore's Federal Practice,* § 41.21[2] (citing, *inter alia, Skinner v. First Am. Bank of Virginia,* 64 F.3d 659, 1995 WL 507264, at *2 (4th Cir.1995) (unpublished) ("Because Rule 41 provides for the dismissal of actions, rather than claims, Rule 15 is technically the proper vehicle to accomplish a partial dismissal. However, similar standards govern the exercise of discretion under either rule."), *cert. denied,* 519 U.S. 824, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996)). Nonetheless, this Circuit has an established practice of applying the Federal Rules of Civil Proce-

dure by "their plain meaning" when the rules are clear and unambiguous. *See, e.g., Marex Titanic, Inc. v. The Wrecked & Abandoned Vessel,* 2 F.3d 544, 546 (4th Cir.1993). Because *Rule* 41(a)(2) applies only to dismissal of "an action," but has a more thoroughly established structure for analyzing dismissal, especially in cases involving a settlement agreement, the Court structures its analysis accordingly.

## II. DISCUSSION

■ As an initial matter, the Court notes the law encourages settlements, *United States v. State of North Carolina,* 180 F.3d 574, 581 (4th Cir.1999), particularly where a government agency charged with protecting the public interest has "pulled the laboring oar in constructing the proposed settlement." *See, e.g., United States v. Vertac Chemical Corp.,* 756 F.Supp. 1215, 1218 (E.D.Ark.1991) (addressing settlement in a CERCLA case) (quoting *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 84 (1st Cir. 1990) (CERCLA)), *aff'd,* 961 F.2d 796 (8th Cir.1992). The Court accepts that policy, albeit tempered by the recognition that "the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances." *Id.* (quoting *F.T.C. v. Standard Financial Mgt. Corp.,* 830 F.2d 404, 408 (1st Cir.1987)). The sophistication of the parties involved, as well as their representation by able counsel, and the nature of the bargaining process further suggest the likelihood the agreement reached represents a just and balanced resolution of the claims among the parties.

### A. *Motion for Voluntary Dismissal with Prejudice*

■ After defendants answer a complaint, unless all parties to the civil action agree to dismissal of the civil action, voluntary dismissal is available only "upon order

of the court and upon such terms and conditions as the court deems proper." Fed.R.Civ.P. 41(a)(2). Disposition of the motion rests within the sound discretion of the Court.

■ Typically, a motion for dismissal without prejudice should not be denied "absent substantial prejudice to the defendant," *Andes v. Versant Corp.,* 788 F.2d 1033, 1036 (4th Cir.1986). Comparatively, actual legal prejudice is the standard rather than the mere prospect of suffering subsequent lawsuits, *Davis v. USX Corp.,* 819 F.2d 1270, 1274–75 (4th Cir.1987).

Here, however, Proponents seek a dismissal with prejudice, which "acts as an adjudication on the merits with full preclusive effect," effectively preventing a finding of legal prejudice. *Bioxy, Inc. v. Birko Corp.,* 935 F.Supp. 737, 740 (E.D.N.C. 1996); *see also Harrison v. Edison Bros. Apparel Stores, Inc.,* 924 F.2d 530, 534 (4th Cir.1991), *abrogation recognized on other grounds by Leach v. Northern Telecom, Inc.,* 141 F.R.D. 420 (E.D.N.C.1991). At least one district court in our Circuit has recognized a plaintiff's motion for dismissal with prejudice should be granted "absent evidence of collusion, an imminent decision on the merits, or other extraordinary circumstances." *Bioxy,* 935 F.Supp. at 740.

The *Bioxy* decision is in accord with other holdings that a court should grant plaintiff's request for dismissal with prejudice because, since plaintiff may not refile the litigation, defendant suffers no prejudice. *See, e.g., Smoot v. Fox,* 340 F.2d 301 (6th Cir.), *cert. denied,* 384 U.S. 909 (1964); *SEC v. Am. Bd. of Trade, Inc.,* 750 F.Supp. 100, 105 (S.D.N.Y.1990); *Shepard v. Egan,* 767 F.Supp. 1158 (D.Mass.1990). These courts also relied on the rationale one should not force a plaintiff to go to trial against a defendant it no longer wishes to sue. *Bioxy,* 935 F.Supp. at 740; *Shepard,* 767 F.Supp. at 1165 ("Could the Court force the plaintiff to continue discovery, or offer evidence? Can or should the Court require plaintiff to litigate a claim when plaintiff herself has attempted to dismiss it?").

Conversely, other courts have held that seeking dismissal with prejudice is not sufficient, without more, to require a court to grant the motion. *See, e.g., Beaver Associates v. Cannon,* 59 F.R.D. 508 (S.D.N.Y. 1973); *Hudson Engineering Co. v. Bingham Pump Co.,* 298 F.Supp. 387 (S.D.N.Y. 1969). A noted commentary describes these cases as holding "the rule [Fed. R.Civ.P. 41(a)(2) ] requires the court to exercise discretion in all cases arising under it, particularly if the dismissal would not determine the suit finally as between all of the parties involved in it." 9 Wright & Miller, *Federal Practice and Procedure* § 2364 (1995).

## B. Settlement Agreement

Moreover, the Court is cognizant the parties have presented for approval a Settlement Agreement, rather than a consent decree. In a footnote, Proponents correctly state "[t]he general rule of law regarding settlement agreements is that settling parties retain the autonomy to fashion their own settlement terms free from the interference of the Court and non-settling parties." [12] Joint Mem. in Supp. at 7 n. 3 (quoting *Collins v. Coastline Constr.,* 820 F.Supp. 270, 273 (E.D.La.1993)). Indeed, federal courts in general "have neither the authority nor the resources to review and approve the settlement of every case brought in the federal court system." *Caplan v. Fellheimer Eichen Braverman & Kaskey,* 68 F.3d 828, 835 (3rd Cir.1995). Generally, however, court approval is required in select case categories, such as class actions, shareholder derivative suits and consent decrees. *Id.* The Court of Appeals for the Third Circuit recently iterated the Fifth Circuit's succinct explanation for the general rule:

---

**12.** The Associations fail to address this point.

"In what can be termed 'ordinary litigation,' that is, lawsuits brought by one private party against another private party that will not affect the rights of any other persons, settlement of the dispute is solely in the hands of the parties. If the parties can agree to terms, they are free to settle the litigation at any time, and the court need not and should not get involved."

*Id.* (quoting *United States v. City of Miami, FL*, 614 F.2d 1322, 1330 (5th Cir.1980), *reh'g granted*, 625 F.2d 1310, *aff'd in part, vacated in part*, 664 F.2d 435 (5th Cir. 1981) (*en banc* )).

■ Nonetheless, the Court is satisfied that, in the instant case, it retains jurisdiction to review the Settlement Agreement. First, our Court of Appeals has confirmed recently that "a district court should not blindly accept the terms of a proposed settlement." *United States v. State of North Carolina*, 180 F.3d 574, 581 (4th Cir.1999) (reversing a district court's refusal to enter a consent decree, but interchanging the terms "consent decree" and "settlement"). Instead, the court "must satisfy itself that the agreement is 'fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.'" *Id.* (quoting *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir.1991)). *See infra* p. 663.

Second, in this particular case, it is appropriate for the Court to review the Settlement Agreement prior to ruling on the motions to dismiss. The policy reasons as illuminated by the Fifth Circuit and recently confirmed by the Third Circuit do not apply in the instant litigation. Throughout the preliminary injunction hearing and at other times, parties on both sides have emphasized this litigation will affect the rights of persons not explicitly party to the suit. They stressed the great

public interest at stake in the instant case, including both the environmental harms and resulting harms to state residents as well as the economic harms to the mining companies and the employees. Within the economic harms, Defendants emphatically claim potential job losses to the employees of the mining companies affected by the case's outcome, as well as revenue losses to the companies' vendors, the mining communities, and the State of West Virginia as a whole.

Also, Plaintiffs differ from the typical "private party" in "ordinary litigation". Plaintiffs brought the litigation as a "citizen suit," a situation in which citizens act as surrogate attorneys general to challenge alleged violations of mandatory, nondiscretionary duties of the officials charged with enforcing environmental statutes. *See* 30 U.S.C. § 1270(a); *see also* Jeffrey G. Miller, *Private Enforcement of Federal Pollution Control Laws Part II*, 14 Envtl. L.Rep. 10063, nn. 87–90 and accompanying text (1984) (stating in cases in which "indigents and public interest groups ... [may] seek injunctive relief requiring the government to properly administer public programs[,] .... Plaintiffs ... are merely surrogate attorneys general, enforcing federal law in the absence of government enforcement."). In that sense, Plaintiffs differ from a typical plaintiff because they seek to represent the public's interest, rather than merely their own interests.

Moreover, although Proponents have presented a "Settlement Agreement" rather than a consent decree,[13] the Court may retain jurisdiction for enforcement of the agreement to "protect its proceedings and vindicate its authority." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Under *Rule* 41(a)(2) a court has the authority to enforce a settlement

---

**13.** The Court recognizes, of course, there are some practical differences between a consent decree and settlement agreement. *See, e.g., Johnston Development Group, Inc. v. Carpenters Local Union No. 1578*, 728 F.Supp. 1142, 1146–47 (D.N.J.1990) (pre-*Kokkonen* ) (outlining the differences between the two, including that a consent decree offers a remedy of contempt of court for a violation of its terms).

agreement if it explicitly retains such authority in its dismissal order. *Id.* at 381–82, 114 S.Ct. 1673. This is so because *Rule* 41(a)(2) specifies, once defendant has filed an answer or a summary judgment motion, an action "shall not be dismissed at the plaintiff's instance save upon order of the court and *upon such terms and conditions as the court deems proper.*" *Id.* (citing Fed.R.Civ.P. 41(a)(2)) (emphasis added). To retain the authority to enforce a settlement agreement, despite the fact that the parties structured their accord as a settlement agreement and not a consent decree, a court must either embody the settlement agreement in its dismissal order or retain jurisdiction over the settlement agreement, explicitly.

Because the Court may be called upon to exercise its authority to enforce the settlement agreement should the parties fail to perform their obligations, it now considers the interest of conserving judicial resources. Consideration of the many issues in this case requires an inter-related scrutiny of various exceedingly complex statutes and regulations, as well as analysis of a voluminous factual record as to any one challenged instance of the pattern and practice allegations. Recently, the Court invested a tremendous amount of judicial resources, both in and out of the courtroom and, yet, the case has not proceeded to trial although its scheduling was expedited to accommodate the parties. Were this or any other court later called upon to address the factual and legal issues raised in this action, merely in the context of interpreting and enforcing the Settlement Agreement, it would require another substantial investment of time and resources.

From this perspective, and following our Court of Appeals' guidance as stated in the *North Carolina* decision, *supra,* it is reasonable to review the Settlement Agreement prior to ruling on the motions to dismiss, to ensure the Agreement is lawful and comports with the goals and purposes of the governing environmental statutes,

and, as well to avoid a later, unnecessary expenditure of judicial resources.

In reviewing the Agreement, the Court is mindful it sits not as a participant to the settlement negotiations. Accordingly, the appropriate standard is not "whether the settlement is one which the court itself might have fashioned, or considers as ideal[.]" *United States v. Kramer,* 19 F.Supp.2d 273, 280 (D.N.J.1998) (CERCLA) (stating the test as "whether the proposed decree is fair, reasonable, and faithful to the objective of the governing statute"); *see also Standard Financial Mgt. Corp.,* 830 F.2d at 408 (1st Cir.1987) (acknowledging the court should approve a consent decree involving a public agency unless " 'unfair, inadequate or unreasonable' ") (citation omitted); *United States v. Akzo Coatings of Am., Inc.,* 949 F.2d 1409, 1426 (6th Cir.1991).

Our Court of Appeals has established that "the court must satisfy itself that the agreement 'is fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.' " *North Carolina,* 180 F.3d at 581 (quoting *United States v. Colorado,* 937 F.2d 505, 509 (10th Cir.1991)). The fairness and adequacy prongs require an assessment of the "strength of the plaintiff's case" as "the necessary steps to ensure that [the Court] is able to reach 'an informed, just and reasoned decision.' " *Id.* The Court should weigh "the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement." *Id.*

### C. The Associations' Standing to Challenge the Agreement

■ The Proponents contend non-settling defendants in a multi-defendant action lack standing to object to a partial settlement agreement unless they can demonstrate they will suffer formal legal prejudice caused by the settlement. *See, e.g., Alumax Mill Prods., Inc. v. Congress Fin. Corp.,* 912 F.2d 996, 1001–02 (8th

Cir.1990); *Quad/Graphics, Inc. v. Fass*, 724 F.2d 1230, 1232–33 (7th Cir.1983) (noting such a standard properly balances the law's encouragement of voluntary settlements and the court's duty to protect the rights of the parties before it).

■ Formal legal prejudice occurs where a non-settling defendant is "strip[ped] of a legal claim or cause of action," *Alumax*, 912 F.2d at 1002, or where the agreement interferes with his contract rights or his ability to seek indemnification or contribution, *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 247 (7th Cir.1992). Conversely, a "showing of injury in fact, such as the prospect of a second lawsuit or the creation of a tactical advantage, is insufficient" to meet the standard. *Quad/Graphics*, 724 F.2d at 1233.

The Associations accept this as the correct standard. Because the Court cannot locate any contrary authority, it applies the agreed standard.

■ The Associations attempt to meet the standard by contending they will suffer formal legal prejudice from the Agreement. They allege a company that previously could have proceeded under a Nationwide Permit 21 ("NWP 21") now will have to apply and qualify for a more onerous individual permit. Because of this, the company will experience a probable two year delay because an Environmental Impact Statement ("EIS") must be performed before an individual permit is granted. The delay, they argue, upsets mining companies' reasonable expectations based on the Corps' previous permitting process. The Court is further informed that a company may be forced to cease operations during the delay, leading to a tremendous loss of jobs and revenue.[14]

The Associations maintain this loss amounts to formal legal prejudice because the company may not challenge the Corps' decision to require an individual permit application, instead of an application under NWP 21, because the Corps' decision is not "final agency action." Second, an action against the Corps, they contend, would be very costly and companies could not recoup their losses. They acknowledge the Agreement has not stripped them of a cause of action, but argue it practically has "rendered any later action meaningless." Associations' Mem. at 6.

The Associations have demonstrated a clear injury in fact, that is, expected delays in the issuance of permits and resultant losses therefrom, but have failed to establish formal legal prejudice. If the Associations' members' reasonable expectations are based on flawed practices, they will not suffer legal injury by changes in compliance to meet legal standards. First, the Associations cite authority that a company may not challenge the Corps' requirement of an individual permit contemporaneously with that determination. *See Industrial Highway Corp. v. Danielson*, 796 F.Supp. 121 (D.N.J.1992).[15] Before an agency makes a final determination on the individual permit, no final agency action has occurred. *Id.* at 127–29. However, the Associations have not demonstrated that, once the Corps makes its final determination on the individual permit, an applicant

---

**14.** The Associations attach an affidavit from William B. Raney, the Coal Association president, with the results of an informal poll of several member coal companies concerning the expected losses that would result from such a delay. The affidavit states it will identify the names of the companies only "if requested by the Court," and only identifies in two instances whether, factually, the permit applications referred to are of such a size and nature as to be so affected by the Agreement.

**15.** The Associations misrepresent the holding of *New Hanover Township v. U.S. Army Corps of Engineers*, 992 F.2d 470 (3rd Cir.1993), by citing it for the same proposition as *Industrial Highway Corp. v. Danielson*, 796 F.Supp. 121 (D.N.J.1992). The *New Hanover* court held the case was not ripe because a Section 401 water quality certificate was required from the state agency before the Corps' decision to allow action under a Nationwide Permit, rather than requiring an individual permit, would impact the applicant.

could not challenge the decision requiring an individual permit application.

Second, mining companies' expectations regarding the permitting process based on the Corps' previous behavior are not rights established by contract, statute or regulation. Instead, they are simply expectations and assumptions that cannot bind and prevent the Corps from exercising its administrative discretion and duties. It is rare that the United States is estopped from taking positions different from those mistakenly taken by its agents on prior occasions. *See, e.g., United States v. Vanhorn,* 20 F.3d 104, 112 n. 19 (4th Cir.1994) ("The Government is simply not bound by the negligent, unauthorized acts of its agents. Federal law is clear that estoppel is rarely, if ever, a valid defense against the Government absent proof of some affirmative misconduct by a Government agent[.]"); *United States v. Bloom,* 925 F.Supp. 426 (E.D.La.1996) ("At a minimum, the government agent must intentionally or recklessly mislead the estoppel claimant; mere negligence is insufficient.") (citing *United States v. Marine Shale Processors,* 81 F.3d 1329, 1349–50 (5th Cir. 1996)), *aff'd,* 112 F.3d 200 (5th Cir.1997). This is not one of those occasions. Third, the Associations admit they have not been stripped of a cause of action or claim, which is the standard for formal legal prejudice.

Without legally cognizable injuries, the Associations lack standing to challenge the terms of the Settlement Agreement. Assuming, however, they had standing and otherwise reviewing the Agreement in accord with Section II.B., *supra,* the Court is of the opinion the Settlement Agreement accords with the law and is fair, reasonable and faithful to the objectives of SMCRA and CWA.

### D. APA Compliance

The Court next addresses the issue of compliance with the law because, if the Agreement constitutes an invalid rulemaking, further inquiry would be obviated.

Under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.,* an agency issuing a proposed rule must offer notice of the proposed rule and opportunity for public comment. 5 U.S.C. § 553. Notice and comment need not be offered for "interpretative rules, general statements of policy, or rules of agency organization, procedure or practice." *Id.* (b). Instead, the notice and comment requirement applies to substantive, or legislative, rules, "which are rules issued by agencies pursuant to statutory authority and which implement the statute; such rules create new rights and have the force and effect of law." *Chen Zhou Chai v. Carroll,* 48 F.3d 1331, 1340 (4th Cir.1995).

Proponents contend the Settlement Agreement contains only interpretative rules. Although the APA has not defined "interpretative rule," courts have construed and defined the term. "[I]nterpretive rules simply state what the administrative agency thinks a statute means, and only remind affected parties of existing duties." *Id.* (citing *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n,* 874 F.2d 205, 207 (4th Cir.1989)); *Wiggins v. Wise,* 951 F.Supp. 614, 619 (S.D.W.Va. 1996) (Faber, J.).

A general statement of policy "allows agencies to announce their tentative intentions for the future without binding themselves." *Chen Zhou Chai,* 48 F.3d at 1341 (citing *Am. Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1046 (D.C.Cir.1987)). It merely "expresses 'without force of law' the agency's 'general intentions for the future.'" *Waste Mgt., Inc. v. United States EPA,* 669 F.Supp. 536, 539 (D.D.C.1987) (citations omitted). "A rule is a general statement of policy if it does not establish a binding norm and leaves agency officials free to exercise their discretion." *Chen Zhou Chai,* 48 F.3d at 1341.

In determining whether a statement is a substantive rule, an agency's own characterization of the rule is indicative, but not dispositive, of the rule's prop-

er categorization. *West Virginia Coal Assoc. v. Reilly,* 728 F.Supp. 1276, 1292 (S.D.W.Va.1989) (Copenhaver, J.) (citing *Chamber of Commerce of the United States v. OSHA,* 636 F.2d 464, 468 (D.C.Cir.1980)), *aff'd,* 932 F.2d 964 (4th Cir.1991). Instead, the Court should consider the agency's "intent in authoring it, as ascertained by an examination of the provision's language, its context, and any available extrinsic evidence." *Jerri's Ceramic Arts,* 874 F.2d at 207–08.

### 1. Long-term resolution.

 In the proposed long-term resolution, the agencies state they will "enter into an agreement to prepare an Environment Impact Statement ("EIS") on a proposal to consider developing agency policies, guidance, and coordinated agency decision-making processes[.]" *Settlement Agreement* at 3.

This provision is not a substantive rule, but rather, a general statement of policy. The parties have agreed on the process the agencies will use, including the agencies' plan to use outside experts and to keep Plaintiffs informed of their progress, without binding the agencies' discretion, as by predetermining the outcome of the EIS. Also, the agreement specifically states, "Except as expressly provided herein, nothing in this Settlement Agreement shall be construed to limit or modify the discretion accorded the Federal Agencies[.]" *Id.* at 9.

### 2. Interim Approach

 Contrary to the Associations' arguments, the provisions outlining the 250 acre guideline are squarely within the ambit of interpretative rules. The interim approach discloses what the Corps thinks the statutory requirement of "minimal adverse effects" means and "reminds affect-ed parties of existing duties." *Jerri's Ceramic Arts,* 874 F.2d at 207. Prior to the Settlement Agreement, there existed a statutory requirement that a nationwide permit be issued only if the Corps determined the proposed activity "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." *See* 33 U.S.C. § 1344(e). Now, in the interim, the Corps has crystalized what it believes this statutory requirement means.

Moreover, contrary to the Associations' assertions, the interim approach does not require that any operation proposing to discharge fill in waters of the United States draining a watershed of 250 acres or more may not be allowed under a NWP 21.[16] Instead, it states that, generally, such an operation will be "considered" to have more than minimal adverse effects. Ostensibly, an applicant might establish otherwise regarding a particular operation and be permitted to proceed under the NWP 21 permit.[17] "A rule does not ... become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted. If that were so, no rule could pass as an interpretation of a legislative rule unless it were confined to parroting the rule or replacing the original vagueness with another." *Am. Mining Congress v. MSHA,* 995 F.2d 1106, 1112 (D.C.Cir.1993).

Furthermore, it is apparent the agencies intended this approach to be an interpretative rule rather than a substantive one. Indeed, the structure of the Settlement Agreement demonstrates the parties anticipate the potential for a future substantive rule change—hence, the preparation of an EIS that may foreshadow developing new policies. In the interim, however, the agencies simply have interpreted the stat-

---

16. Similarly, the Associations' assertion that the Corps will now disregard the mitigation plans included in a permit application has no support in the language of the Agreement itself.

17. Consequently, the Associations' argument that the interim approach violates the Corps' regulations is without merit.

utory requirement and adopted more precise guidelines.

Finally, the provisions regarding interagency coordination are, again, simply agreements as to the process the agencies will use, without binding the agencies' discretion.[18] These provisions qualify as general statements of policy because they "announce their tentative intentions for the future without binding themselves." *Chen Zhou Chai*, 48 F.3d at 1341 (citing *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C.Cir.1987)).

Consequently, because the Settlement Agreement does not contain substantive rules, the provisions need not undergo a notice-and-comment period and the Agreement does not violate the APA.

### E. NEPA Compliance

■ The Associations likewise contend the Agreement violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, which requires that an EIS be prepared by an unbiased contractor chosen solely by the agency to avoid a conflict of interest. *See* 40 C.F.R. § 1506.5(c). The Associations argue that because the agencies have agreed to retain two consultants, mutually acceptable to the agencies and Plaintiffs, NEPA will be violated.

This argument fails upon close reading of the NEPA regulations and the Agreement. In the Agreement, the agencies state they will retain consultants "to *assist the agencies* in preparing the EIS[.]" *Settlement Agreement* at 4. Nothing in the Agreement states or implies that anyone

other than the agencies will be preparing the EIS. Further, nothing in the Agreement suggests that, should the agencies determine to hire a contractor to prepare it, anyone other than the agencies will perform the selection or anyone other than an unbiased contractor will be selected. Accordingly, the Associations' argument lacks merit.

### F. Equal Protection

■ The Associations next argue the Agreement is invalid because it violates "the equal protection component of the Fifth Amendment's Due Process clause and the Equal Protection clause of the Fourteenth Amendment" by applying to surface mining operations in West Virginia, but not other states. Associations' Mem. Response at 15. Recognizing the applicability of the rational relationship test, the Associations argue Federal Defendants have no rational basis for treating surface mining operations in West Virginia differently from those in other states.

Because there is no suspect class or fundamental right at issue, the Court applies the least stringent Equal Protection test. Thus, the Associations must prove Federal Defendants had no rational basis related to a legitimate government interest to support their decision. The Associations fail to carry the burden. As the Proponents respond, changes applicable only in West Virginia are rational because a September 1998 Fish and Wildlife Service report showed more miles of streams filled by valley fills in West Virginia than in any other Appalachian state.[19] Propo-

---

**18.** WVDEP notes it is to begin the inter-agency coordination process when it receives a permit application for a surface coal mining and reclamation operation that would result in excess spoil disposal sites in valley fills in "waters of the United States" requiring a CWA permit. It requests the Court to make explicit the Corps' duty to identify for WVDEP which West Virginia waters are "waters of the United States." The Corps has not responded to this request. Noting WVDEP's argument that it lacks the authority to identify these waters on its own, and the explicit goal

of inter-agency coordination, the Court **HOLDS** the Corps must identify these waters as part of its responsibilities under the Settlement Agreement.

**19.** A recent draft report by OSM found far less mountaintop removal mining occurring in Virginia, when compared with the amount occurring in West Virginia, and fewer problems with the mining that is permitted. Ken Ward, Jr., *Virginia operators rebuild mountains, OSM report says*, Charleston Gazette, June 8, 1999, at A3 (" 'Overall, our study

nents' Reply Mem. at 16. Similarly, both witness testimony in the preliminary injunction hearing and the Court's March 3, 1998 memorandum Opinion and Order recognized the unique topography of southern West Virginia, especially in the context of valley fills. Accordingly, the Associations fail to demonstrate the Federal Defendants' decision to take action in West Virginia is "arbitrary state action—action that has no rational basis." *Abril v. Virginia*, 145 F.3d 182, 188 (4th Cir.1998).

### G. *Impermissible Delegation of Executive Authority*

■ The Associations further contend the Agreement represents an impermissible delegation of executive authority because the Federal Defendants have ceded to Plaintiffs the right to choose consultants to perform the EIS, the right to comment on individual permits, the right to participate in the "scoping" process for the EIS, and the right to participate in a dispute resolution process as to the terms of the Settlement Agreement. Associations' Mem. Resp. at 19.

First, as explained *supra*, the consultants who are mutually acceptable to Plaintiffs and Federal Defendants will assist the agencies in preparing the EIS only, not prepare it themselves. The Associations do not argue, and the Court does not believe, it is an impermissible delegation of authority to allow a party outside a federal agency to recommend and agree upon the selection of contractors to assist the agencies in performing an EIS.

Second, under existing regulations, the general public enjoys the right to comment on individual permits. *See* 33 C.F.R. § 325.3 (1999). Similarly, the general public enjoys the right to participate in the scoping process for an EIS. *See id.* § 230.12; *see also* 64 Fed.Reg. 5800 (Feb.

5, 1999) (notice of intent to prepare an EIS in this matter). Thus, when the Settlement Agreement recognizes Plaintiffs' right to comment on individual permits or to participate in the scoping process, it is not ceding any of its rights and responsibilities or awarding any new or additional rights; it is observing rights already afforded.

Third, the Associations do not explain why they believe the dispute resolution process is an impermissible delegation of executive authority. It is difficult to divine their reasoning. Unless they attack a federal agency's right to enter a Settlement Agreement, which they do not appear to do, a federal agency must have the right also to include a dispute resolution mechanism within the Agreement. The Associations also do not appear to attack the structure of the dispute resolution process itself. Consequently, the Court finds the Associations fail to raise a compelling argument on this ground.

### H. *Fairness, Reasonableness, and Faithfulness to the Governing Statutes*

■ The Associations further contend the Agreement is not fair or reasonable because 1) it causes severe hardship to the coal mining industry and 2) terms within it are unclear.

First, the Associations' argument about hardship to the industry relies on its earlier argument of expected delays in permitting and the resulting losses therefrom. *See supra* pp. 660–61. The Court recognizes that, at first, a longer permitting process will occasion delays previously unexpected, resulting in hardship to the mining companies. As recognized *supra*, however, mining companies enjoyed only a mere expectation that the permitting process would continue as previously. The Corps has explicated a crisper guideline of

found that Virginia is successfully reclaiming mine sites and is limiting the amount of material disposed of in excess fills,' OSM says."). The Court does not rely upon or accept the

OSM draft nor the conclusions drawn by the *Gazette* writer; it merely suggests there may be palpable differences in enforcement decisions, state by state.

what it believes the statutory requirement of minimal adverse environmental effects means. In so doing, the Corps was acting within its discretion and duty to administer the laws within its domain. Just as the hardship argument was an insufficient basis to establish formal legal prejudice, predictable delays to mining permits are insufficient to derail an otherwise fair, reasonable and lawful Settlement Agreement executed by a federal agency.

Second, the Associations list several areas in which they believe the Agreement is unclear and, therefore, unreasonable. Their best arguments are that it is unclear the type of mining operations to which the Agreement applies; whether very small fills, such as stream crossings, could come within the 250 acre guideline; and whether pending permit applications are subject to the interim mechanism.[20] As demonstrated *infra*, each of these arguments fail.

Upon close reading, the Agreement does specify what types of mining operations are within its scope. The Agreement applies to "any application for mountaintop mining operations in the State of West Virginia;" in turn, "mountaintop mining operations" are defined as those that result in "excess spoil disposal sites in valley fills" in West Virginia. *Settlement Agreement* at 3–4. Although the Court recognizes this issue could have been eliminated completely by a simple definitional paragraph in the Agreement, the slight uncertainty created by the absence of such a paragraph does not rise to the level of making the Agreement unfair or unreasonable.

Further, a very small fill as, for example a stream crossing, does not come within

the parameters of the Agreement because it would not result in "excess spoil disposal sites in valley fills." *See Settlement Agreement* at 3–4. Moreover, the parties' intent to exclude very small fills, such as stream crossings, from the 250 acre guideline in Paragraph 11 of the Agreement is evident. The guiding principle in Paragraph 11 is expressed in its first sentence: "Prior to the completion of the EIS process and issuance of any record(s) of decision, any application for mountaintop mining operations in the State of West Virginia *that would result in more than minimal adverse effects in waters of the United States* will require an individual Corps permit under CWA section 404 for all overburden and other fill material (hereafter "fill") in waters of the United States." *Id.* at 4–5 (emphasis added). Presumably, a very small fill such as a stream crossing would not result in more than minimal adverse environmental effects and, thus, would not require an individual section 404 permit.

Moreover, it is apparent the Agreement applies to pending permit applications. The Court so holds. The Agreement states the interim approach applies to "any application for mountaintop mining operations in the State of West Virginia." *Id.* at 4. Also, it states "the MOU will apply to all such pending and future permits described in paragraph 11 until this MOU is amended or rescinded." *Id.* at 7. Again, although this could have been stated more precisely, the slight lack of clarity is immaterial. The Associations further attack the provision that states, "as a general matter," mining operations discharging fill in waters draining a watershed of 250 or more acres will require an individual permit.

---

**20.** As to the Associations' other arguments, the Court notes the interim approach is contemplated to continue until "the completion of the EIS process and issuance of any record(s) of decision." *Settlement Agreement* at 4. The EIS is expected to be completed no later than 24 months after the Agreement's effective date.

Also, the Associations complain the Agreement does not provide guidance as to how the

Corps and EPA will evaluate the number of watersheds affected by proposed discharge of fill material or when individual permits will be required of such impacts. However, if the Agreement provided such guidance, surely the Associations would challenge it as a substantive rulemaking restricting the agency's discretion. Furthermore, the agencies are not required to state explicitly how they will proceed in performing their duties.

They charge that such language implies that some applications will not require an individual permit, without stating under what conditions such an event could occur. Again, the Associations ignore the guiding principle of Paragraph 11: operations that will result in more than minimal adverse effects in waters of the United States will require an individual permit. An application over the 250 acre guideline may be able to demonstrate that it will not cause more than minimal effects and, therefore, it might proceed permissibly under a NWP 21 permit. The Agreement is clear enough and it does not control the discretion committed to the agency.

In conclusion, apart from the Associations' challenges, the Court has reviewed the Agreement as a whole, against the backdrop of this litigation, in general, and the memoranda submitted, in particular. The Court concludes the Agreement is fair, adequate, reasonable, and faithful to the environmental statutes under which the litigation was brought. The Court has considered the strength of Plaintiffs' case in order to review the fairness and adequacy of the Agreement. *North Carolina*, 180 F.3d at 581. It has also considered the "extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel[.]" *Id.* In this review, the public interest is a "key consideration." *Akzo Coatings*, 949 F.2d at 1435.

Here, the Agreement provides a rational approach to resolving the claims against the Federal Defendants and to addressing the larger issues raised in this case, with input and coordination among the various affected federal and state agencies. Moreover, it supplies an incrementally more efficient and logical method of reviewing all permit applications submitted and necessarily required before a company can proceed with mining operations. Finally, the Agreement is in the public interest by resolving, in a fair, adequate and reasonable manner, issues that presented risks to both the environment and economy.

## I. Retention of Jurisdiction under Kokkonen

The Court notes one potential problem with the Agreement, not raised by any litigant. The Agreement stipulates the claims against Federal Defendants are to be dismissed with prejudice. As stated *supra*, dismissal with prejudice "acts as an adjudication on the merits with full preclusive effect." *Bioxy*, 935 F.Supp. at 740; *see also Harrison*, 924 F.2d at 534. However, inexplicably, the Agreement states that, if a dispute between the parties cannot be resolved amicably, "Plaintiffs' sole remedy is to refile the litigation." *Settlement Agreement* at 11. Certainly the parties cannot be seeking a dismissal with prejudice that lacks any res judicata or collateral estoppel effects.

Cognizant of its capacity under *Kokkonen* and its progeny to retain jurisdiction to enforce and interpret the Settlement Agreement, *see, e.g., DiMucci v. DiMucci*, 91 F.3d 845, 848 (7th Cir.1996) (district court has ancillary jurisdiction under *Kokkonen* to "interpret and enforce"), the Court construes "refile the litigation" to mean the parties wish the Court to retain jurisdiction to address violations of the Settlement Agreement that cannot be worked out among the parties. This construction avoids the fatal error of directly contradicting the well-established meaning and effect of dismissal with prejudice, while nonetheless observing the parties' intention to (1) attempt to resolve disagreements without court involvement, and (2) have a forum for resolution of any disagreements they cannot resolve independently of a judicial officer.

To ensure such a forum, and pursuant to *Rule* 41(a)(2), the Court dismisses *Counts* 11, 12 and 13 but retains jurisdiction to interpret and enforce the Settlement Agreement until it has been fully performed. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ("When dismissal is pursuant to Federal Rule of

Civil Procedure 41(a)(2) ... the parties' compliance with the terms of the settlement contract (or the court's "retention of jurisdiction" over the settlement contract) may, in the court's discretion, be one of the terms set forth in the order."); *see also Indiana Lumbermens Mutual Ins. Co. v. Info. Sys., Inc.*, 83 F.3d 415 (4th Cir.1996) (unpublished) (recognizing *Kokkonen*'s principle). In so ordering, the Court does not seek to frustrate or amend the parties' agreement that contempt of court is not available as a remedy.[21]

### J. Leave to file Second Amended Complaint

On July 16, 1998 Plaintiffs filed their original Complaint containing ten counts against Miano alleging a pattern and practice of violations of his non-discretionary duties under SMCRA and three counts (*Counts* 11, 12, and 13) against the Federal Defendants alleging violations of the CWA and NEPA. The Court's November 5, 1998 Scheduling Order provided that motions to amend pleadings were due by December 5, 1998. On December 30, 1998 the Court granted Plaintiffs' timely motion for leave to file an Amended Complaint, which made corrections to the original Complaint and added two new counts against Miano alleging further violations of his non-discretionary duties under SMCRA, which comprised additions to Plaintiffs' overall pattern and practice allegation. Plaintiffs now request leave to file a Second Amended Complaint, incorporating changes in the structure of this case following the Settlement Agreement.[22]

Because responsive pleadings have been filed, Plaintiffs may amend under *Rule* 15(a) "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). " '[D]isposition of a motion to amend is within the sound discretion of the district court.' " *Murray v. State Farm Fire & Cas. Co.*, 870 F.Supp. 123, 125–26 (S.D.W.Va.1994) (Haden, C.J.) (quoting *Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir. 1987), *cert. denied* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 483 (1988)), *quoted in Gum v. General Electric Co.*, 5 F.Supp.2d 412, 414 (S.D.W.Va.1998) (Haden, C.J.).

Our Court of Appeals has stated the test for amended pleadings:

[I]t is well settled that, "in the absence of any apparent or declared reason— such as undue delay, bad faith, or dilatory motive on the part of the movant, ... undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be freely given." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Moreover, delay in requesting the amendment is generally not a sufficient reason, by itself, to deny the requested motion. *See Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.), *cert. dismissed,* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980). Delay, however, can be a sufficient reason for denial of leave when accompanied by futility or prejudice to the non-movant. *See Deasy v. Hill*, 833

---

21. WVDEP argues contempt of court should be available as a remedy to it because the provision applies only to "the parties," which WVDEP argues refers to Plaintiffs and Federal Defendants. On the contrary, the Court believes "the parties" refers to the signatories to the Agreement. This includes WVDEP. Nonetheless, the Court considers WVDEP's concerns about the dispute resolution process can be addressed by the Court's retention of jurisdiction over the Settlement Agreement.

22. Plaintiffs' motion was filed on January 6, 1999, two weeks after the date of the Settlement Agreement. (The procedural posture of this motion is discussed in Section I.B., *supra*.) The parties requested the Court hold the motion to amend in abeyance while it considered the Settlement Agreement. *See supra* note 2. Thus, while Plaintiffs' motion to amend did not fall strictly within the timeframe of the Court's Scheduling Order, Plaintiffs did file the motion with reasonable diligence after presenting the Settlement Agreement to the Court.

F.2d 38, 40 (4th Cir.1987), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 483 (1988).

*HealthSouth Rehabilitation Hospital v. Am. National Red Cross,* 101 F.3d 1005, 1010 (4th Cir.1996), *cert. denied,* 520 U.S. 1264, 117 S.Ct. 2432, 138 L.Ed.2d 194 (1997). *See also Smith v. Angelone,* 111 F.3d 1126, 1133–35 (4th Cir.1997) (applying the test and affirming the district court's denial of the motion to amend), *cert. denied,* 521 U.S. 1131, 118 S.Ct. 2, 138 L.Ed.2d 1036 (1997).

Regarding dismissal, the Settlement Agreement provides in pertinent part:

> The Plaintiffs agree to dismiss all claims against the Federal Defendants with prejudice within one business day of the Effective Date of this Settlement Agreement. The parties further agree that Plaintiffs reserve the right to challenge under the APA any future Corps' CWA section 404 authorization for any valley fill in waters of the United States that may be authorized by the Corps after the Effective Date of this Settlement Agreement.

*Settlement Agreement* at 8.

> The parties agree that Hobet Mining, Inc.'s Spruce Mine No. 1 (S–5013–97) is not subject to this Settlement Agreement. Plaintiffs reserve the right to challenge under the APA any Corps' CWA section 404 authorization for discharges associated with this surface mine. *As a purely procedural matter, the parties agree that Plaintiffs may*

*seek to present this challenge by amendment to the complaint rather than by filing a new action.*

*Id.* at 8 (emphasis added).

The Second Amended Complaint carries forward this provision. *Counts* 11, 12, and 13 alleging violations of the CWA and NEPA by the Federal Defendants are deleted.[23] *Count* 1, which is based on the same allegations as Count 12, is also deleted.[24] As the Settlement Agreement provides, newly added *Counts* 16 and 17 challenge the Corps' section 404 authorization regarding Hobet's Spruce Fork mine. *Count* 16 alleges Federal Defendant Robinson's refusal and failure to prepare an environmental impact statement for the Spruce Fork mine violates NEPA. *Count* 17 alleges Robinson's failure to require Hobet to apply for an individual (instead of a nationwide) permit for Spruce Fork violates the CWA.[25] Plaintiffs challenge both actions under the APA as arbitrary, capricious, and an abuse of discretion. Finally, the Second Amended Complaint narrows *Count* 4 to violations of state water quality standards only in intermittent and perennial streams.

The Second Amended Complaint simply reshapes and narrows this civil action in light of the Settlement Agreement resolutions. Applying *Rule* 15(a) standards, the Court considers whether this motion to amend the pleadings imposes either prejudice or futility upon the non-movants. No Defendant is prejudiced by the settlement and dismissal of *Counts* 11,

---

**23.** These are the three counts the Court now dismisses.

**24.** *Count* 12 alleges the Corps Defendants are engaged in a pattern and practice of granting nationwide permits for valley fills under section 404 of the CWA, rather than requiring permits under section 402. *Count* 1 alleges Miano fails to require section 402 permits for valley fills, allowing them to be permitted under section 404.

**25.** Defendant Hobet Mining, Inc. ("Hobet") has also moved to modify or clarify the scope of the Court's preliminary injunction Order of

March 3, 1999 to allow the Corps to process an individual section 404 permit for the full extent of Hobet's proposed valley fills at the Spruce Fork mine. Hobet wishes to submit an application to the Corps for an individual section 404 permit, but is concerned that the Corps will not start to process the application because the Court's Order enjoins the Corps from issuing any permits. The Court **GRANTS** the motion and clarifies preliminary injunction Order to allow the Corps to process an individual section 404 permit for the full extent of Hobet's proposed valley fills at the Spruce Fork mine.

12, and 13; the Federal Defendants have agreed to the dismissal and the remaining Defendants' potential prejudice has been considered, *supra*, and found not to prohibit dismissal of these counts. Added *Counts* 16 and 17 similarly run only against a single Federal Defendant, who is agreeable to Plaintiffs' maintaining those counts. The two new counts simply focus former *Counts* 11 and 13, making the same allegations, but now only against Hobet's Spruce Fork mine. Mindful that *Rule* 15(a) commands "leave [to amend] shall be freely given when justice so requires," the Court **GRANTS** Plaintiffs' motion for leave to file the Second Amended Complaint.

### III. CONCLUSION

Accordingly, the Court (1) **GRANTS** in part the revised motion to dismiss claims against Federal Defendants and **ORDERS** *Counts* 11, 12 and 13 **DISMISSED;** (2) **DENIES** as moot Plaintiffs' motion to dismiss claims against Federal Defendants; (3) **DENIES** as moot Plaintiffs' motion for summary judgment, declaratory judgment and permanent injunction on *Count* 12; (4) **DENIES** as moot the Associations' letterform motion requesting a status conference; (5) **GRANTS** Plaintiffs' motion for leave to file a Second Amended Complaint; (6) **DIRECTS** the Second Amended Complaint to be filed; and (7) **GRANTS** Hobet's motion to modify or clarify the Preliminary Injunction Order of March 3, 1999.