**AMERICAN CANOE ASSOCIATION, INC. and American Littoral Society, Plaintiffs,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., Defendants.**

No. 98–979–A.

United States District Court, E.D. Virginia, Alexandria Division.

July 12, 1999.

622

Dale R. Schmidt, Alexandria, VA, for plaintiffs.

Helen Fahey, United States Attorney, Sharon L. Parrish, Assistant United States Attorney, Alexandria, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

The gravamen of this complex action is the plaintiffs'[1] allegation that they and their members have been harmed in their attempts to make aesthetic and recreational use of Virginia's rivers, streams, and coastlines because defendant, the United States Environmental Protection Agency (EPA), has failed to perform certain dis-

---

1. Plaintiffs in this action are the American Canoe Association and the American Littoral Society, two nonprofit membership organiza-tions dedicated to the preservation and protection of American waterways and their surrounding environments.

cretionary and nondiscretionary duties imposed on it by the Clean Water Act[2] (CWA) and the Endangered Species Act[3] (ESA), in conjunction with the Administrative Procedure Act[4] (APA). The Virginia Association of Municipal Wastewater Agencies (VAMWA), a membership association consisting of major municipal wastewater operators throughout Virginia, was granted leave to intervene as a defendant.[5] Seeking a sensible and amicable resolution of the technically complex and novel issues presented, the parties engaged in extensive settlement negotiations. At length, and with the mediation assistance of a magistrate judge of this division, the plaintiffs and EPA reached a settlement of all issues in controversy and submitted a proposed consent decree embodying the settlement details. VAMWA objected to the settlement decree as illegal. Following a hearing on the matter, the Court overruled VAMWA's objection, approved the settlement as fair, legal, and in the public interest, and entered the proposed decree. This memorandum opinion elucidates the reasons for this result.

## I.

The factual and statutory background underlying this suit are more fully set out in *American Canoe Association v. United States Environmental Protection Agency*, 30 F.Supp.2d 908 (E.D.Va.1998), in which defendants' motion to dismiss the complaint was granted in part, denied in part, and deferred in part. A brief recapitulation suffices here. In essence, plaintiffs' surviving claims allege that EPA has failed to perform its duties under the CWA to identify Virginia's most heavily polluted waters and restore the chemical, physical, and biological integrity of those waters. Central to plaintiffs' allegation that EPA has failed to perform its duties under the CWA is their contention that EPA has a duty to establish total maximum daily loads (TMDLs) of pollutants for Virginia waters that it has failed to fulfill. The CWA compels states to establish TMDLs of pollutants for those waters within their boundaries that do not meet, or are not expected to meet, water quality standards even after the imposition of various enumerated controls and treatments. 33 U.S.C. § 1313(d)(1)(C). A TMDL represents the highest level at which a pollutant may be "loaded" into a water body without violating water quality standards. Thus, TMDLs must be established "at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality" for all pollutants that prevent or are expected to prevent the attainment of water quality standards.[6] *Id.; see also* 40 C.F.R. § 130.7(c)(1)(ii).

According to the CWA, Virginia was to have submitted initial TMDLs to EPA by June 26, 1979, and thereafter from "time to time." 33 U.S.C. § 1313(d)(2). Federal regulation states that the deadlines for these subsequent submissions are to be determined by the EPA regional administrator and the state. 40 C.F.R.

---

2. 33 U.S.C. § 1294 *et seq.*

3. 16 U.S.C. § 1531 *et seq.*

4. 5 U.S.C. § 551 *et seq.*

5. *See American Canoe Ass'n v. United States Envtl. Protection Agency*, C.A. 98–979–A (E.D.Va. Sept. 8, 1998).

6. As the statutory language suggests, TMDL creation is a technically complex process. According to regulation, TMDLs must be established at levels necessary to attain both numerical and narrative water quality standards, taking into account critical conditions for stream flow, loading, and water quality parameters. 40 C.F.R. § 130.7(c)(1). TMDLs may be established using either a pollutant or pollutant or biomonitoring approach, though the regulation states that in many cases, both approaches may be needed. *Id.* The regulation also requires the use of site-specific information whenever possible. *Id.*

§ 130.7(d)(1).[7] When a state submits a TMDL, EPA must approve or disapprove the submission within thirty days, and in the event a TMDL is disapproved, EPA has thirty days from the date of disapproval to establish an appropriate TMDL. 33 U.S.C. § 1313(d)(2). In the nearly twenty years that have elapsed since the initial 1979 deadline, Virginia either has submitted no TMDLs or has submitted a single TMDL for one small tributary in the state,[8] and EPA has never established any TMDL for any of Virginia's waters. In ruling on defendants' motion to dismiss, this Court previously held that Virginia's twenty-year failure to submit TMDLs for EPA approval could properly be construed as a constructive submission that no TMDLs were necessary, triggering EPA's duty to approve or disapprove the constructive submission of "no TMDLs." See *American Canoe Ass'n*, 30 F.Supp.2d at 920–22.

The consent decree proposed by plaintiffs and EPA seeks to rectify this long inaction by specifying an eleven-year schedule for the establishment of TMDLs for several hundred enumerated waters in Virginia. According to the decree, EPA expects Virginia either (i) to develop and submit TMDLs for the identified waters in accordance with the consent decree's schedule or (ii) to provide data and information showing that TMDLs are unnecessary according to that schedule. Should Virginia fail to meet the specified schedule, the decree sets deadlines by which EPA will establish TMDLs for various categories of waters.

The schedule for TMDL submissions is divided into four parts, with separate schedules for the creation of TMDLs for each of four categories of Virginia waters. The waters are categorized according to the sources or characteristics of their pollution, and each category currently includes 200 or more specific waters.[9] According to the schedule, TMDLs for all "Category 1," "Category 3," and "Category 4" waters will be established by May 1, 2011, and TMDLs for all "Category 2" waters will be established by May 1, 2006. The dates set forth in the consent decree for establishing TMDLs allot sufficient time for public notice of the TMDLs, consideration of public comment, revision of the TMDLs as necessary, and EPA final action on the TMDLs.[10]

7. The relevant portion of the regulation reads: "All TMDLs established under paragraph (c) for water quality limited segments shall continue to be submitted to EPA for review and approval. Schedules for submission of TMDLs shall be determined by the Regional Administrator and the State."

8. The parties dispute whether Virginia in fact submitted a TMDL for the "Unnamed Tributary to Fawn Creek," a Virginia stream less than half a mile long. Although this dispute remains unresolved, no judicial resolution is required given the entry of the consent decree.

9. The proposed consent decree provides that EPA shall a file a motion to amend the consent decree to include any waters not currently listed that may appear on the next § 303(d) list approved for Virginia. *See generally infra* note 12. This ensures that TMDLs will be established for all waters identified as "water quality limited segments" over the next two years.

10. The proposed consent decree also contains several provisions unrelated to TMDLs in settlement of plaintiffs' other claims in this lawsuit. For instance, among other requirements, the consent decree provides (i) that EPA and Virginia shall consider various specified water-quality data in developing the next § 303(d) list for Virginia, *see* 40 C.F.R, § 130.7(b)(5); (ii) that EPA shall provide a water-body specific rationale for the omission of any waters from the § 303(d) list that are included in the enumerated waters, *cf.* 40 C.F.R. § 130.7(b)(6); (iii) that EPA shall review Virginia's continuing planning process (CPP) by November 1, 2000, and provide public notice of and opportunity to comment on this CPP, *see* 33 U.S.C. § 1313(e); and (4) that EPA shall comply with the ESA by consulting with the U.S. Fish and Wildlife Service and/or the National Marine Fisheries Service prior to approving or establishing any § 303(d) list or TMDL, *see* 16 U.S.C. § 1536(a)(2). The consent decree also requires that EPA shall report annually to plaintiffs regarding their compliance with the consent decree during the previous year.

VAMWA objects to entry of the consent decree on the basis of this TMDL schedule. First, VAMWA argues EPA has no authority to establish a TMDL schedule unilaterally, without state consultation, absent a judicial or EPA finding that Virginia's failure to submit TMDLs amounts to a constructive submission that no TMDLs are necessary. Since there has been no such finding in this instance, VAMWA asserts that the schedule set forth in the consent decree violates EPA's regulation requiring that any schedule for TMDL submission be set in consultation with Virginia. Second, VAMWA contends that similarly, if Virginia fails to submit TMDLs according to the consent decree schedule, EPA is without authority to establish TMDLs in Virginia's place, since there has been no finding of constructive submission in this case.

## II.

As the Fourth Circuit has recently reiterated, when "considering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are to be encouraged." *United States v. North Carolina*, 180 F.3d 574, 583 (4th Cir.1999). This principle is especially apposite in cases where, as here, the parties' expertise and comparative freedom in crafting a remedy promise a more sensible and practical resolution to the problems presented by complex this litigation than that likely to result from judicial intervention. Additionally, in a complex case settled by consent decree, "where a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement," a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility. *Bragg v. Robertson*, 54 F.Supp.2d 653, 660 (S.D.W.Va.1999); *see also Kelley v. Thomas Solvent Co.*, 717 F.Supp. 507, 515–16 (W.D.Mich.1989). Nevertheless, courts may not examine the terms of a proposed

consent decree uncritically, *see Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975); rather, a court must "satisfy itself that the agreement is fair, adequate, and reasonable and is not illegal, the product of a collusion, or against the public interest," *North Carolina*, at 583. Thus, this standard presents a two-part inquiry: (i) is the agreement illegal, collusive, or otherwise against public policy and (ii) is it fair, adequate, and reasonable? Although they are undeniably intertwined, the two inquiries merit separate attention.

## III.

VAMWA contends that the agreement is illegal on the basis of what is essentially a single objection to the proposed consent decree. It is, simply put, that the decree wrests the initiative for establishing TMDLs from Virginia, in violation of the CWA. More specifically, the argument is as follows: since EPA has not declared Virginia's twenty-year failure to submit TMDLs a constructive submission that no TMDLs are necessary, control over the TMDL program still lies in Virginia's hands, and EPA is without authority either to craft a schedule for TMDL submission unilaterally or to create TMDLs in the face of the state's failure to abide by this schedule. Although the previous ruling on EPA's motion to dismiss the TMDL claims in this case strongly implied that Virginia's failure to submit TMDLs to EPA at any point during the twenty-year period following the 1979 deadline was properly characterized as a constructive submission, a specific finding in this regard was not necessary for the disposition of the motion. And since the parties reached a settlement prior to any summary judgment ruling on this point, whether a constructive submission of no TMDLs has occurred in this case remains unresolved. In addition, by means of the proposed consent decree, EPA seeks to ensure the development of TMDLs while avoiding the necessity of formally declaring at this time that Virginia's inaction

amounts to a constructive submission of no TMDLs, perhaps because under the CWA such a declaration would require EPA either to approve or disapprove the "no TMDLs" submission in thirty days and (in the likely event of disapproval) issue TMDLs for Virginia within thirty days thereafter, a tight and unforgiving schedule that would impose immediate and significant burdens on EPA and leave little or no room for Virginia's further participation in the process. *See* 33 U.S.C. § 1313(d)(2). Thus, VAMWA is correct when it states that there has yet been no judicial or agency determination that a constructive submission has occurred here. Given this, the question presented is the scope of EPA's authority to act in the absence of a submission or constructive submission of TMDLs by Virginia.

The CWA places primary responsibility for TMDL development on the states. *See generally* 33 U.S.C. § 1313(d). Yet, in the absence of a submission or constructive submission, EPA is not without a role. As provided by regulation, EPA must, together with the state, determine schedules for the submission of TMDLs. *See* 40 C.F.R. § 130.7(d)(1). Thus, the CWA and its implementing regulations envision a federal-state cooperative process of TMDL development in which EPA is an active participant. VAMWA, however, emphasizes the mandatory nature of the word "shall" in the regulation's provision that "[s]chedules for submission of TMDLs shall be determined by the Regional Administrator and the State." *Id.* This, VAMWA argues, establishes a regulatory requirement that both EPA *and* the state must participate

in setting any TMDL schedule. Because Virginia did not participate in the creation of the schedule set out in the proposed consent decree, VAMWA argues, this schedule is illegal and invalid.

■ This argument ultimately fails because, contrary to VAMWA's assertions, Virginia did participate in the creation of the schedule, by virtue of its execution of a Memorandum of Understanding (MOU) with EPA in November 1998.[11] The MOU sets out a schedule of "goals" of dates by which Virginia will develop and submit TMDLs for those waters on its approved 1998 § 303(d) list and for any waters added to its approved § 303(d) lists through the year 2004.[12] This schedule extends through 2010.

The schedule set out in the consent decree is consistent with the MOU, in that the consent decree deadlines by which Virginia must take final action in developing TMDLs are either identical to those set out in the MOU or, in one instance, elaborated *infra*, more generous to Virginia. To be sure, the consent decree imposes various interim deadlines for Virginia submissions not specified in the MOU. Yet, close examination reveals that such interim deadlines serve merely to refine the MOU schedule. For instance, the MOU memorializes Virginia's agreement to prepare and submit TMDLs for all impaired shellfish waters[13] appearing on the approved 1998 § 303(d) list by 2010. The consent decree adopts this deadline and further indicates that Virginia shall reach this goal by submitting 50% of TMDLs for impaired shellfish waters by 2006 and 65% of TMDLs for impaired shellfish waters by 2008. In the

11. The MOU was executed in November 1998 by the Regional Administrator for EPA Region III, the Director of the Virginia Department of Environmental Quality, and the Director of the Virginia Department of Conservation and Recreation.

12. Section 303(d)(1) of the CWA requires every state to identify those waters within its boundaries that do not meet, or are not expected to meet, water quality standards even after the imposition of various enumerated

controls and treatments. 33 U.S.C. § 1313(d)(1). These waters are known as "water quality limited segments" (WQLSs), and the submission from a state identifying these waters is known as a " § 303(d) list." Pursuant to regulation, states submit § 303(d) lists every two years. *See* 40 C.F.R. § 130.7(d)(1).

13. In the parlance of the MOU and the consent decree, these are "Category 3" waters.

absence of submissions from Virginia, the proposed consent decree provides that EPA shall develop the appropriate TMDLs by 2007, 2009, and 2011, respectively. While the consent decree specifies deadlines for interim progress in the submission of TMDLs that remain unspoken in the MOU, in so doing it merely formalizes what is necessarily implied by any rational interpretation of the MOU, namely that the parties envisioned not that Virginia would prepare and submit TMDLs for all impaired shellfish waters in the state on the eve of 2010's deadline for final action, but instead that Virginia would make reasonably steady, incremental progress toward this goal over the course of the intervening eleven years.[14] Thus the decree merely makes more concrete the pace of the reasonably steady, incremental progress necessarily inherent, if unspoken, in the MOU.

By entering into the MOU, Virginia thus clearly participated in determining the overarching schedules that are merely refined by the consent decree. Moreover, while Virginia did not formally agree to the interim deadlines for state submissions of TMDLs set out in the consent decree, the record supports the inference that it does not object to these refinements of the MOU. EPA provided copies of the proposed consent decree to legal and technical representatives of the Virginia Department of Environment Quality at the time it was filed with the Court. In the two weeks before the consent decree was approved and entered, Virginia, while taking no formal position, expressed no objections to the schedules set out in the consent decree. Moreover, Virginia always had the option of formally participating in the creation of the current schedule by seeking to intervene in the instant lawsuit, of which it had ample notice. *See* Rule 24, Fed.R.Civ.P. Virginia chose not to avail itself of this opportunity, nor even to voice any objections to EPA or plaintiffs informally. EPA has interpreted Virginia's participation in executing the MOU and its failure to object to the proposed consent decree as state involvement sufficient to meet regulatory requirements. In this regard, it is important to note that EPA's regulations do not on their face require that Virginia and the EPA jointly determine every particular of the TMDL submission schedule. They simply indicate that TMDL submission schedules shall be set by the state and EPA. *See* 40 C.F.R. § 130.7(d)(1). In this instance, EPA has concluded that it is not required by law to consult with Virginia regarding every aspect of the proposed TMDL schedule when Virginia has played a crucial role in establishing the larger system of deadlines that shape and organize the proposed consent decree. EPA's interpretation of its own regulation, which cannot be said to be plainly erroneous or inconsistent with 40

---

14. The consent decree makes similar adjustments to the schedules set out in the MOU for TMDL development for other categories of state waters. Thus, for "Category 1" waters (which are those waters primarily affected by nonpoint source pollution), the consent decree schedule precisely mirrors the MOU schedule, except that the consent decree schedule also includes those waters that have been added to Virginia's § 303(d) list in the months since the execution of the MOU. Additionally, in the MOU, Virginia committed to a goal of submitting TMDLs by 2003 for all "Category 2" waters (which are waters listed because point sources discharging to these waters have water quality-based effluent limitations that are not stringent enough to achieve applicable water quality standards). Under the consent decree, some state submissions for "Category 2" waters are not required until 2005, two years *after* the MOU schedule, thus providing a two-year cushion for final action by Virginia. Additionally, the consent decree sets interim deadlines for TMDL submissions for other "Category 2" waters in 2002 and 2003. Finally, in the MOU, Virginia committed to setting TMDLs for 200 miscellaneous waters known as "Category 4" waters by 2010. Again, the consent decree establishes interim deadlines for submission of these TMDLs, requiring that 25% of these TMDLs be submitted by 2004, 50% by 2006, 75% by 2008, and 100% by the final 2010 deadline. In all instances, the added deadlines in the proposed consent decree flow naturally from a reasonable reading of the MOU schedule.

C.F.R. § 130.7(d)(1),[15] is entitled to substantial deference.[16] As a result, the agency's interpretation of § 130.7(d)(1) must be sustained here.

The remaining question, then, is whether EPA may commit to establishing TMDLs itself if Virginia fails to comply with the schedule in the consent decree. VAMWA argues that EPA creation of TMDLs is appropriate only in the context of a state's constructive submission that no TMDLs are necessary. VAMWA's contention seems to be that even if Virginia misses any or all of the deadlines set out in the proposed consent decree, as long as Virginia demonstrates any attempts to comply with the schedule and any effort toward establishing TMDLs, EPA is precluded from finding that Virginia has made a constructive submission that no TMDLs are necessary. Put yet another way, VAMWA posits that as long as the state is making some incremental progress toward developing and submitting TMDLs for its waterways, EPA is powerless to intrude upon the state process and that the consent decree is therefore illegal and illegitimate.

■ This argument fails; VAMWA's reading of EPA's authority under the

CWA is too miserly. Given that "the CWA should be liberally construed to achieve its objectives—in this case to impose a duty on the EPA to establish TMDL's when the states have defaulted by refusal to act over a long period," [17] EPA clearly has the authority to construe Virginia's failure to comply with the decree's TMDL schedule, if such failure should occur, as a constructive submission of no TMDLs. And, in this event, EPA also has the authority under the CWA either to approve or disapprove the submission and, in the event of disapproval, promulgate its own TMDLs for Virginia. *See* 33 U.S.C. § 1313(d)(1)(2). This is precisely the scheme established in and the agency response required by the consent decree.[18] Were VAMWA correct that Virginia could prevent EPA intervention merely by demonstrating that it was undertaking some minimal efforts toward TMDL establishment as decade after decade and deadline after deadline slipped away, the requirements of the CWA could easily be rendered a dead letter by state subterfuge and recalcitrance. The law neither requires nor permits this absurd result.

Virginia has been given ample time to prepare TMDLs and is given yet more time by the schedule in the proposed con-

---

**15.** Nor is this conclusion inconsistent with the statutory text from which the relevant regulation derives. Section 130.7(d)(1) explicates the CWA's requirement that states submit TMDLs to EPA "from time to time." 33 U.S.C. § 1313(d). This statutory language does not itself require any consultation with the state in the establishment of TMDL submission schedules.

**16.** *See, e.g., Friends of Iwo Jima v. National Capital Planning Comm'n,* 176 F.3d 768, 774 (4th Cir.1999) ("Reviewing courts give great deference ... to an agency's interpretation of its own rules and regulations."); *Clinchfield Coal Co. v. Jewell Ridge Coal Corp.,* 149 F.3d 307, 308 (4th Cir.1998) ("When we are reviewing the [agency's] interpretation of its own regulations, the [agency's] interpretation is entitled to substantial deference and will be sustained unless it is plainly erroneous or inconsistent with the regulation."); *United States v. Hoechst Celanese Corp.,* 128 F.3d 216, 221 (4th Cir.1997) ("When an agency

applies its 'regulation to complex or changing circumstances' ... this 'calls upon the agency's unique expertise and policymaking prerogatives' and courts must 'presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers.' ") (quoting *Martin v. OSHRC,* 499 U.S. 144, 151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)).

**17.** *Scott v. Hammond,* 741 F.2d 992, 998 (7th Cir.1984).

**18.** Alternatively, were Virginia to communicate expressly to EPA prior to a scheduled deadline that it would not or could not comply with the schedule, EPA could reasonably term this explicit refusal to act as an *actual* (rather than constructive) submission of "no TMDLs," which again would trigger EPA's responsibility to approve or disapprove the submission and promulgate TMDLs in the event of disapproval.

sent decree. If Virginia continues in its failure to create and establish TMDLs, the CWA requires that EPA eventually acknowledge this failure and step into the breach. *See generally* 33 U.S.C. § 1313(d)(2); *see also American Canoe Ass'n,* 30 F.Supp.2d at 919–23. The schedule in the proposed consent decree merely makes explicit the moment at which this acknowledgment shall occur, thus giving Virginia fair warning and maximizing the potential for informed state participation. In so doing, it in no way violates either the letter or the spirit of the CWA. Rather, it ensures that the CWA shall not be reduced to empty formalism.

### IV.

■ Although VAMWA makes no specific objection to the fairness, adequacy, or reasonableness of the consent decree, a reviewing court's independent duty of examination requires consideration of these factors. *See North Carolina,* at 583. Importantly in this regard, the consent decree is wholly consistent with the CWA. It does not diminish or erode state authority in a manner inconsistent with the CWA statutory scheme or impose undue burdens on Virginia. The proposed consent decree envisions a process in which Virginia exercises the primary responsibility and authority for the creation of TMDLs for Virginia waters. But prudently, the consent decree provides that should Virginia fail in this respect, EPA must step in to ensure that TMDLs are in fact established for Virginia waters. Such an arrangement accurately reflects the CWA's requirements and purpose.

Nor is there any unfairness to third parties, who will also have opportunity to participate in the process by which TMDLs are established, since by regulation, any TMDL submitted to EPA must be the subject of public notice, with a period allowed for public comment. In addition, the biennial § 303(d) listing process includes a notice and comment period in which groups and individuals may submit technical information regarding any state waters to the state and EPA for consideration. Thus, the consent decree adequately accommodates public involvement in the TMDL creation process, thereby ensuring reasonable fairness in the process.

In summary, the consent decree is manifestly fair and in the public interest as it ensures, following two decades of inaction, that TMDLs will at last be established for Virginia's waters. Given the complexity of TMDL creation,[19] the schedule for establishment of these TMDLs is an appropriately prompt response.

### V.

For these reasons, intervenor's objections to the entry of the consent decree are overruled and the joint motion to enter the consent decree must be granted. The consent decree represents a fair and reasonable solution to a difficult problem and evidences a substantial commitment to enforcement of the CWA's requirements in Virginia. As such, it is a proper and welcome resolution of this action. An appropriate order has entered.