**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**State of NORTH CAROLINA; North Carolina Department of Correction, an agency of the State of North Carolina; Mack Jarvis, in his official capacity as Secretary of the North Carolina Department of Correction; Dan Stieneke, in his official capacity as Director of the Division of Prisons, a *division of the North Carolina Department* of Correction, Defendants–Appellees.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**State of North Carolina; North Carolina Department Of Correction, an agency of the State of North Carolina; Mack Jarvis, in his official capacity as Secretary of the North Carolina Department of Correction; Dan Stieneke, in his official capacity as Di-**

rector of the Division of Prisons, a division of the North Carolina Department of Correction, Defendants–Appellants.

Nos. 98–1759, 98–1805.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 27, 1999.

Decided June 11, 1999.

**ARGUED:** Miriam Rachel Eisenstein, United States Department of Justice, Washington, D.C., for Appellant. William Dale Talbert, Special Deputy Attorney General, James Peeler Smith, Special Deputy Attorney General, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Bill Lann Lee, Acting Assistant Attorney General, Dennis J. Dimsey, United States Department of Justice, Washington, D.C., for Appellant. Michael F. Easley, North Carolina Attorney General, Raleigh, North Carolina, for Appellees.

Before WILKINS, WILLIAMS, and MOTZ, Circuit Judges.

Reversed and remanded by published opinion. Judge WILKINS wrote the opinion, in which Judge WILLIAMS and Judge DIANA GRIBBON MOTZ joined.

## OPINION

WILKINS, Circuit Judge:

The United States appeals an order of the district court refusing to enter a consent decree that would have settled litigation between the United States and the State of North Carolina[1] concerning alleged gender discrimination in the hiring and promotion of correctional officers (CO's) for the North Carolina Department of Correction (NCDOC).[2] Because we conclude that the refusal to enter the consent decree constituted an abuse of discretion, we reverse and remand with instructions to enter the consent decree.

1. The United States brought this action against the State of North Carolina, the North Carolina Department of Correction, the Secretary of the North Carolina Department of Correction, and the Director of the Division of Prisons of the North Carolina Department of Correction. For ease of reference, we refer to these defendants collectively as "the State."

2. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C.A. § 1292(a)(1) (West 1993). *See Carson v. American Brands, Inc.,* 450 U.S. 79, 83–84, 89–90, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (holding that a refusal to enter a consent decree that contains prospective relief is appealable pursuant to § 1292(a)(1) because it has the practical effect of denying an injunction); *id.* at 86–88, 101 S.Ct. 993 (explaining that an order refusing to enter a settlement agreement has the "serious, perhaps irreparable, consequence" of the loss of an opportunity to settle on negotiated terms and can only be effectually challenged in an interlocutory appeal; thus, such an order satisfies the requirements for appealability under § 1292(a)(1) (internal quotation marks omitted)).

## I.

The United States began investigating the hiring practices of the NCDOC in early 1991. In August 1992, the United States informed the Attorney General of North Carolina that the investigation had revealed that the NCDOC was engaging in a pattern or practice of gender discrimination with respect to CO positions in prisons housing male inmates. This pattern or practice was demonstrated, the United States asserted, by the facts that the NCDOC had the smallest percentage of female CO's (eight percent) of any state department of correction and that stringent restrictions were placed on the assignments that could be given to female CO's, thereby limiting employment availability and promotion opportunities.

During the following year and a half, the parties engaged in settlement negotiations in an effort to avoid litigation. Nevertheless, on December 7, 1993, the United States filed this suit pursuant to 42 U.S.C.A. § 2000e–6 (West 1994) alleging that the NCDOC was engaging in a pattern or practice of gender discrimination. Settlement negotiations continued during the discovery phase of litigation. In August 1995, the parties agreed upon a settlement, presented a consent decree to the district court, and jointly moved for its entry.

The terms of the consent decree may be summarized as follows. First, the State agreed to numerous forms of prospective relief. The State obligated itself to create an organizational structure within the NCDOC to ensure compliance with the obligations of Title VII in general and the consent decree in particular. The State also agreed to actively recruit women for entry-level and supervisory CO positions, employing various means detailed in the consent decree. The goal of these recruitment measures was "to achieve the employment of women in correctional officer positions at correctional institutions housing male inmates in numbers approximating their interest in, and ability to qualify for, such positions." J.A. 145–46. The State further agreed to develop uniform qualifications and procedures for the hiring and promotion of CO's.[3] The consent decree provided that female CO's would be employed on the same basis as males with the exception that the NCDOC would not be required to assign female CO's to strip-search male prisoners. The agreement specified, however, that no more than 25 percent of CO positions, and no supervisory positions, were to be designated "male-only." J.A. 158.

Second, the State agreed to provide equitable and compensatory relief to identified victims of discrimination. Under the terms of the consent decree, monetary relief in the form of back pay would be available to (1) women who applied for and were denied employment or promotions on the basis of their sex ("discriminatees"); and (2) women who were qualified for CO positions and who would have applied but for a reasonable belief that they would not be hired because of their sex ("futility claimants"). The agreement required the State to provide $5.5 million to fund claims for back pay. Discriminatees and futility claimants also were eligible for non-monetary relief in the form of priority hiring or promotion, retroactive seniority, and retroactive pension status. Priority hiring was limited to 464 identified victims of discrimination, and priority promotion was limited to 35 victims.

In order to notify potential individual claimants of the settlement, the consent decree required that the State provide notice of the settlement to all current and former female NCDOC employees and all women who had applied and been rejected for positions between December 31, 1983 and December 31, 1992; additionally, the

---

**3.** Previously, each prison within the NCDOC had acted autonomously in recruiting, hiring, and promoting CO's.

State agreed to publish notice of the settlement in several newspapers for three consecutive weeks in an effort to locate potential futility claimants. The agreement set forth procedures for the identification and resolution of claims and established that all disputes were to be resolved by the district court. Finally, the consent decree provided that the State's obligation to provide prospective relief would cease three years after entry of the agreement by the district court and that the obligation to provide relief to individual claimants would cease upon resolution of all individual claims.

The district court provisionally entered the consent decree and scheduled a fairness hearing for December 4, 1995. In support of the consent decree, the United States presented a statistical analysis indicating that from 1984 through 1992, prisons within the NCDOC hired 618 fewer women than would be expected given the percentage of qualified female applicants—a difference of more than 18 standard deviations. The statistical shortfall for each year equaled more than five standard deviations for every year except 1992. The analysis did not include 1993 and 1994, however. The United States also identified 37 women who claimed to have been discriminated against during the relevant period.

Following the fairness hearing, the district court issued an order vacating its provisional entry of the consent decree. *See United States v. North Carolina*, 914 F.Supp. 1257 (E.D.N.C.1996). The court extensively criticized the terms of the consent decree, characterizing them as "a wide array of expensive and intrusive mandates of unresolved value, necessity, and legality." *Id.* at 1260. The court indicated that it was inclined to reject the consent decree based upon these criticisms. *See id.* at 1263. However, the court did not reach the issue of whether the agreement should be entered because it concluded that a significant question existed as to the presence of subject matter jurisdiction.

More specifically, the court expressed doubt that the United States had proffered sufficient evidence of ongoing discrimination to create a case or controversy. Accordingly, the district court ordered the United States to show cause why the court possessed subject matter jurisdiction. *See id.* at 1275. Further, the court informed the State that it was "permitted to withdraw its consent to the agreement and ... resume a position adversary to that of" the United States. *Id.*

The United States responded to the show cause order, and the district court held a hearing on subject matter jurisdiction. More than a year later, on May 9, 1997, the court entered an order stating that "this Court has determined that [the United States] had pled a proper basis for this Court's subject matter jurisdiction." J.A. 381. Thereafter, the United States again moved for entry of the consent decree. The State opposed entry of the consent decree and moved to dismiss, or in the alternative for summary judgment, on the basis of lack of subject matter jurisdiction. The State also formally moved for permission to withdraw from the consent decree.

The district court, relying on its May 7 ruling, denied the motion to dismiss or for summary judgment. The district court then refused to enter the consent decree, citing three reasons. First, the court noted that because its approval was a condition precedent to the State's duty to perform under the consent decree, the decree was "merely an executory contract." J.A. 543. Second, the court observed that the State had indicated its desire to withdraw from the agreement. Third, the court determined that there had been material changes in circumstances since the formation of the agreement. One such change, according to the court, was that

the State has taken an aggressive posture in the hiring, assignment, and promotional practices within the [NCDOC] with respect to women as employees. These steps materially affect the present

employment posture of women within the NCDOC and make the remedies fashioned at an earlier time, when materially different circumstances were present, no longer responsive and relevant to conditions as they now exist. J.A. 543–44. The court also noted that, since the drafting of the consent decree and its submission to the court, the North Carolina legislature had enacted a statute requiring prior legislative approval of the settlement and another provision mandating that the Attorney General of North Carolina provide a written opinion regarding the advisability of any settlement requiring payment of $75,000 or more of public funds. The court concluded, "In light of the executory nature of the contract, the State's request to withdraw from the agreement, and the material change in circumstances, it would be unreasonable and an abuse of discretion for the Court to enforce an agreement that is no longer relevant to the conditions now existing." J.A. 544.

## II.

Before turning to the issues raised by the United States' appeal, we first consider the State's assertion on cross appeal that the district court lacked subject matter jurisdiction. In making this argument, the State concedes that the United States properly pled adequate jurisdictional facts in its complaint. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982) (explaining that a defendant may challenge subject matter jurisdiction on the basis that the complaint "fails to allege facts upon which subject matter jurisdiction can be based"). The State maintains, however, that these jurisdictional allegations are false.

■ A defendant may attack subject matter jurisdiction by contending that the jurisdictional allegations of the complaint are false, in which case a district court may hold an evidentiary hearing to determine whether the facts support the jurisdictional allegations. *See id.* A factual attack on the jurisdictional allegations of a complaint is permissible so long as it does not involve the merits of the action. *See id.* at 1219–20; *see also Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir.1997). When a factual attack on subject matter jurisdiction involves the merits of a dispute, " '[t]he proper course of action for the district court . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.' " *Garcia*, 104 F.3d at 1261 (quoting *Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir.1981) (second alteration in original)); *see id.* (explaining that courts should "refus[e] to treat indirect attacks on the merits as [Federal Rule of Civil Procedure] 12(b)(1) motions" (internal quotation marks omitted)).

■ The State's argument that the district court lacks subject matter jurisdiction is premised on the language of the statute that authorizes the action. Title VII allows the United States to file a civil suit "[w]henever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter." 42 U.S.C.A. § 2000e–6. The State argues that this statutory language imposes a jurisdictional requirement that the Attorney General have reasonable cause to believe that a pattern or practice of discrimination is ongoing at the time of filing of a lawsuit. The State further maintains that the Attorney General could not have had reasonable cause to believe that a pattern or practice of discrimination was ongoing when this suit was filed in 1993 because there was no evidence to support a finding that the NCDOC was discriminating against women in 1993.

■ We conclude that the question of whether a pattern or practice of discrimination was ongoing when this action was filed in 1993 is intertwined with the merits of the action. In order to prevail on the merits, the United States must prove that the NCDOC engaged in a pattern or prac-

tice of discrimination. *See Lowery v. Circuit City Stores, Inc.,* 158 F.3d 742, 759–60 (4th Cir.1998), *petition for cert. filed,* 67 U.S.L.W. 3409 (U.S. Dec. 14, 1998) (No. 98–97). Similarly, the State asserts that the existence of subject matter jurisdiction depends on proof that a pattern or practice of discrimination was ongoing when the action was filed. Thus, while the merits and jurisdictional questions are not identical, they are so closely related that the jurisdictional issue is not suited for resolution in the context of a motion to dismiss for lack of subject matter jurisdiction. *See Adams,* 697 F.2d at 1219.[4]

### III.

 The United States contends that the district court erred in refusing to enter the consent decree. In considering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are encouraged. *See Durrett v. Housing Authority of City of Providence,* 896 F.2d 600, 604 (1st Cir.1990). Nevertheless, a district court should not blindly accept the terms of a proposed settlement. *See Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975). Rather, before entering a consent decree the court must satisfy itself that the agreement "is fair, adequate, and reasonable" and "is not illegal, a product of

collusion, or against the public interest." *United States v. Colorado,* 937 F.2d 505, 509 (10th Cir.1991). In considering the fairness and adequacy of a proposed settlement, the court must assess the strength of the plaintiff's case. *See Flinn,* 528 F.2d at 1172–73. While this assessment does not require the court to conduct "a trial or a rehearsal of the trial," the court must take the necessary steps to ensure that it is able to reach "an informed, just and reasoned decision." *Id.* (internal quotation marks omitted). In particular, the "court should consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement." *Carson v. American Brands, Inc.,* 606 F.2d 420, 430 (4th Cir.1979) (en banc) (Winter, Circuit Judge, dissenting), *adopted by Carson v. American Brands, Inc.,* 654 F.2d 300, 301 (4th Cir.1981) (en banc)(per curiam). We review the decision of the district court to accept or reject a proposed settlement for abuse of discretion. *See Flinn,* 528 F.2d at 1172.

 Here, the parties do not dispute that the applicable factors generally weigh in favor of entry of the consent decree.[5] Accordingly, the only question before us is whether the district court abused its discretion in refusing to enter

---

4. The State also maintains that if its challenge to subject matter jurisdiction is intertwined with the merits of the action, this court should reverse the denial of summary judgment by the district court on the basis that the United States' claim lacks merit. Although denials of summary judgment are not ordinarily appealable, *see O'Connor v. United States,* 956 F.2d 48, 52 (4th Cir.1992), the State argues that we may consider the denial of summary judgment through the exercise of pendent appellate jurisdiction.

Once a court has jurisdiction over an appealable order, an exercise of pendent appellate jurisdiction over another, interlocutory ruling is permissible only if "the other issue is (1) inextricably intertwined with the decision of the lower court [on the appealable issue] or (2) consideration of the additional issue is necessary to ensure meaningful review of the [appealable issue]." *Taylor v. Waters,* 81 F.3d

429, 437 (4th Cir.1996). These requirements are not satisfied here because the merits of the United States' claim are not inextricably intertwined with the question of whether the district court abused its discretion in refusing to enter the consent decree, nor is consideration of the merits necessary to meaningful review of the appealable question.

5. The district court did not expressly consider the factors set forth in *Flinn* and *Carson* despite having conducted a fairness hearing during which it heard testimony that would have allowed it to reach a reasoned decision concerning the fairness and adequacy of the settlement agreement. Although we do not rely on this failure as a basis for reversal, we note that the better practice would be for the district courts to consider the factors set forth in *Flinn* and *Carson* in oral or written rulings.

the settlement agreement on the bases set forth in its order. As noted previously, the district court relied on the executory nature of the consent decree, the fact that the State wished to withdraw from the settlement, and the changed circumstances affecting the terms of the decree. None of these circumstances is a proper basis for refusal to enter the consent decree. To begin, while we have no reason to doubt that the district court was correct that the consent decree remained an executory contract until approved by the court, this fact has no conceivable impact on the fairness or adequacy of the agreement. Further, a party's change of heart regarding a settlement is not a valid basis upon which to refuse approval. *See Petty v. Timken Corp.*, 849 F.2d 130, 133 (4th Cir.1988) (holding that "[u]nless the ... settlement is substantially unfair, judicial economy commands that a party be held to the terms of a voluntary agreement" and that "second thoughts ... do[ ] not ... establish unfairness or justify setting aside an otherwise valid agreement").

■■ Additionally, the changed circumstances identified by the district court do not justify its refusal to approve the settlement decree. The court initially noted that the North Carolina legislature had enacted legislation requiring the NCDOC to report any proposed settlement to several legislative committees, *see* 1997 N.C. Sess. Laws 1344, 1770, and requiring the Attorney General to issue a written opinion regarding the advisability of any settlement providing for payment of $75,000 or more of public funds, *see* N.C. Gen.Stat. § 114–2.4 (Supp.1997). We conclude that these enactments do not provide a basis for refusing to enter the consent decree. At most, they are procedural hurdles that the district court could have overcome by directing the State to comply with the requirements.

■■ The district court also determined that the great strides the NCDOC had made in hiring and promoting women constituted changed circumstances that

rendered approval of the consent decree improper. Again, we disagree. Most importantly, the increased hiring of female CO's neither affects the need for remedial measures for past victims of discrimination nor renders the remedial provisions of the settlement inadequate or unfair. Additionally, there is no evidence indicating that the increased hiring of women has accomplished the central goal of the prospective-relief provisions of the consent decree—that the NCDOC hire and promote female CO's in proportion to the percentage of qualified female applicants.

In holding that the district court abused its discretion, we do not mean to denigrate the great strides the NCDOC has made toward eliminating gender discrimination in the hiring and promotion of CO's. To the contrary, it may well be the case that this progress justifies modification, perhaps even to a significant degree, of various provisions of the consent decree pursuant to Federal Rule of Civil Procedure 60(b)(6). We simply hold that such considerations were not a proper basis upon which to refuse to enter the consent decree. We believe that the proper course is for the consent decree to be entered as the parties agreed and then to allow the parties to seek modifications from the district court as circumstances may justify. *See National Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 266 (4th Cir.1993) (noting that Rule 60(b)(6) "has been described as a grand reservoir of equitable power to do justice in a particular case" (internal quotation marks omitted)). Accordingly, we reverse and remand with instructions to enter the consent decree.

### IV.

■■ The United States also argues that this court should assign the case to a different district court judge on remand, maintaining that the judge who rendered the decision below has prejudged the issues. Absent a claim of bias—which the United States does not make here—reas-

signment is appropriate in "unusual circumstances where both for the judge's sake and the appearance of justice an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality." *United States v. Guglielmi,* 929 F.2d 1001, 1007 (4th Cir.1991) (internal quotation marks omitted). In determining whether such circumstances exist, a court should consider

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected,

(2) whether reassignment is advisable to preserve the appearance of justice, and

(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* (internal quotation marks omitted).

 We conclude that reassignment is not necessary here. Although the United States notes that the district court judge harshly criticized the terms of the consent decree and expressed doubt regarding the existence of subject matter jurisdiction, we find no indication that the judge could not put these views out of his mind. Indeed, he appears already to have done so: The judge did not rely on any of its criticisms of the consent decree in refusing to enter it and ultimately concluded that the United States had pled subject matter jurisdiction. Further, we conclude that the district court judge's willingness to reconsider previously expressed views weighs against a finding that reassignment is necessary to preserve the appearance of justice. *See Maldonado Santiago v. Velazquez Garcia,* 821 F.2d 822, 832–33 (1st Cir.1987) (explaining that whether a judge can lay aside previously expressed views is relevant in determining whether reassignment is necessary to preserve appearance of justice). And, in light of the lengthy history of this case, reassignment would entail a waste of judicial resources that is disproportionate to any increased appearance of fairness. Accordingly, we reject the request for reassignment.

### V.

In sum, we conclude that the State's factual challenge to subject matter jurisdiction is intertwined with the merits of the case and thus is not suited to resolution in the context of a motion to dismiss. And, we hold that while modification of the consent decree may be appropriate, the district court abused its discretion in refusing to approve the settlement. Accordingly, we reverse and remand with instructions to enter the consent decree. We decline to assign the case to a different district court judge.

*REVERSED AND REMANDED*