Filed: February 8, 2011

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-2259
(1:84-cv-04409-JFM)

L.J.,

             Plaintiff – Appellee,

     v.

BRIAN WILBON; BALTIMORE CITY DEPARTMENT OF SOCIAL SERVICES;
MARYLAND DEPARTMENT OF HUMAN RESOURCES,

             Defendants – Appellants,

     and

BRENDA DONALD,

             Defendant.

O R D E R

     The Court amends its opinion filed January 26, 2011, as follows:

     On page 8, footnote 3, lines 11 and 12 -- the name "McGwire" is replaced with the name "McGrath."

                              For the Court – By Direction

                              /s/ Patricia S. Connor
                                      Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

L.J.,

*Plaintiff-Appellee,*

v.

BRIAN WILBON; BALTIMORE CITY
DEPARTMENT OF SOCIAL SERVICES;
MARYLAND DEPARTMENT OF HUMAN
RESOURCES,

*Defendants-Appellants,*

and

BRENDA DONALD,

*Defendant.*

No. 09-2259

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(1:84-cv-04409-JFM)

Argued: October 27, 2010

Decided: January 26, 2011

Before KING and DUNCAN, Circuit Judges, and
Bobby R. BALDOCK, Senior Circuit Judge of the
United States Court of Appeals for the Tenth Circuit,
sitting by designation.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge King and Senior Judge Baldock concurred.

---

## COUNSEL

**ARGUED**: Julia Doyle Bernhardt, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants. Mitchell Y. Mirviss, VENABLE, LLP, Baltimore, Maryland, for Appellee. **ON BRIEF:** Douglas F. Gansler, Attorney General, John B. Howard, Jr., Deputy Attorney General, David E. Beller, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants. Rhonda B. Lipkin, PUBLIC JUSTICE CENTER, INC., Baltimore, Maryland, for Appellee.

---

## OPINION

DUNCAN, Circuit Judge:

This is an appeal from the denial of a motion under Federal Rule of Civil Procedure 60(b)(5) to vacate a 1988 consent decree and from the entry of a subsequent modified decree. Both decrees were designed to reform the Baltimore, Maryland foster care system. The appeal is based on allegations that changes in the law brought about by Supreme Court decisions have eliminated the legal bases for the decrees. We affirm the well-reasoned decision of the district court.

### I.

The parties to this appeal have a lengthy history together, an understanding of which is essential to a consideration of the issues presented. In 1984, Appellees, a class of foster chil-

dren in the care and custody of the Baltimore City Department of Social Services ("BCDSS"), brought a civil rights action pursuant to 42 U.S.C. § 1983 against BCDSS and numerous city and state foster care officials and personnel ("Appellants"). The complaint alleged that Appellants' mismanagement of the Baltimore foster care program resulted in the children suffering physical abuse, sexual abuse, medical neglect, and otherwise being subjected to dangerous living conditions. It further asserted that Appellants' actions and failings violated Appellees' rights under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. § 620 *et seq.*, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The action sought equitable relief and monetary damages.

In 1987, after conducting extensive discovery that included a random sampling review of BCDSS foster care records, Appellees filed a motion for a preliminary injunction. The motion alleged that class members were at risk of suffering irreparable harm caused by abuse and neglect, inadequate medical care, and the placement of certain children in unlicensed homes, where they were not provided regular foster care services. The motion also alleged that BCDSS had failed to "undertake adequate and effective measures to address deficiencies in the [foster care] system" revealed by the BCDSS's own review of its services. *L.J. v. Massinga*, 699 F. Supp. 508, 529 (D. Md. 1988) ("*L.J. III*").[1] BCDSS's review, which was conducted by a group that became known as the Harris Task Force, had uncovered numerous problems. These included a shortage of foster care homes, insufficient staff, poor training, and a general absence of adequate safeguards

---

[1]The district court's 1987 order on the preliminary injunction ("*L.J. I*") was not included in the federal supplement nor published electronically. However, the district court's 1988 order approving the consent decree ("*L.J. III*") included the text of the 1987 preliminary injunction order as an attachment. Therefore references in this opinion to the 1987 preliminary injunction order will cite to the court's 1988 published opinion in *L.J. III*.

and oversight to ensure the children's safety. *See id.* at 533-34 (detailing the findings of the Harris Task Force).

Following a two-week evidentiary hearing, the district court found that Appellees had "offered sufficient evidence to establish the existence of serious systemic deficiencies in the Baltimore foster care system." *Id.* at 538. These deficiencies included "the failure to implement policies to protect children in foster care; the lack of an effective effort to recruit new foster homes; the licensing of questionable homes; the granting of exceptions allowing homes that should be closed to remain open; and the incomplete medical histories of children in foster care." *Id.* The district court noted that, although BCDSS had made some efforts to respond to the problems highlighted by the Harris Task Force, those attempts were "incomplete and ineffective." *Id.* at 534. It concluded that Appellees were "likely to suffer severe physical and emotional injury" and that their "constitutional right to protection while in defendants' custody [was] in jeopardy." *Id.* at 538.

The district court also held that Appellees had shown a likelihood of success on the merits on both their statutory and constitutional claims. It found that, given the magnitude of the problems exposed during the hearing on the motion, "it appears unlikely that defendants will be able to prove they are in compliance" with their statutory duties. *Id.* at 539. It also determined that "plaintiffs have demonstrated the existence of a 'special relationship' with defendants such that plaintiffs are owed an affirmative duty of protection by defendants" under the Due Process Clause. *Id.*

The district court granted a preliminary injunction requiring Appellants to submit a plan for review of each foster care home where there had been a report of maltreatment, conduct frequent visits to all foster homes, implement measures to improve the medical care provided to foster children, and submit reports of all new complaints of maltreatment to the juve-

nile court and to Appellees' attorney, together with reports of actions taken to address those complaints. *Id.* at 540.

Appellants challenged the entry of the preliminary injunction before this court, alleging that they were immune to damage claims under 42 U.S.C. § 1983. They argued that children in foster care had no statutory rights that were privately enforceable. In addition, they invoked "the principle that immunity in the performance of discretionary duties exists where the law governing official conduct is unsettled" and alleged that Appellees' constitutional rights were not "clearly established" in a way sufficient to overcome qualified immunity. *L.J. v. Massinga*, 838 F.2d 118, 122 (4th Cir. 1988) ("*L.J. II*").

This court affirmed the entry of the preliminary injunction. In so doing, we noted that Appellants did not "seriously" argue "with respect to prospective relief that if plaintiffs prove their allegations, which they have already demonstrated have an arguably solid foundation, plaintiffs will have proven a violation of their due process rights under the Fourteenth Amendment." *Id.* However, we found that it was unnecessary to reach the issue of Appellees' constitutional rights because Appellants' "statutory duty was clear and certain and therefore they are not entitled to invoke the immunity defense." *Id.*

We detailed a number of statutory duties including "maintaining standards for foster family homes and child care," 42 U.S.C. § 671(a)(10), "implementation and operation of 'a case review system'" for each child, *id.* at §§ 627(a)(2)(B), 671(a)(16), and reporting to law enforcement any suspicion of abuse, neglect, or exploitation in the placement home or institution, *id.* § 671(a)(9). *L.J. II*, 838 F.2d at 122-23. We held that the "statutory provisions spell out a standard of conduct, and as a corollary rights in plaintiffs, which plaintiffs have alleged have been denied." *Id.* at 123. We further noted that although "the statutes are largely statutes relating to appropri-

ations . . . they are privately enforceable under 42 U.S.C. § 1983." *Id.* We therefore upheld the injunction.

Following our affirmance of the preliminary injunction, the parties engaged in six weeks of settlement negotiations. The negotiations produced a proposed consent decree intended "to settle and resolve all claims for declaratory relief and equitable relief, including injunctive relief." *L.J. III*, 699 F. Supp. at 518-19. The district court described the decree as follows:

> The consent decree that embodies the settlement retains substantially those measures ordered by the [district] court as preliminary injunctive relief. It also seeks to make substantial improvements in several aspects of the foster care system including placing limits on the number of cases a worker may be responsible for, improving the system for providing medical treatment to foster children, providing assistance to natural parents that would allow children to remain with them thereby avoiding foster care where possible, and providing for a continuum of appropriate foster care placements including the recruitment of new foster homes. Different improvements are to be implemented at different times; however, all improvements are to be made within two years.

*Id.* at 511.

After a thorough review of its provisions, the district court found that "if properly implemented, the consent decree will result in substantial and needed improvements in Baltimore's foster care system, and is adequate to protect the interests of these plaintiffs." *Id.* at 515. As a result, it held the decree to be "fair, reasonable, adequate and deserving of approval." *Id.* at 518.

For the first few years, Appellants' periodic reports to the court indicated substantial compliance with the consent

decree requirements.[2] In 2002, however, Maryland's Department of Legislative Services ("DLS") conducted an audit of BCDSS foster care services and identified a number of deficiencies. These included inadequate security checks for foster placements, inadequate health care for the children, and no school attendance records for many of the children. Appellees then conducted their own investigation, which revealed a number of alleged inaccuracies in BCDSS's compliance reports to the court. When these inaccuracies came to light, Maryland's General Assembly asked DLS to address the reliability of Appellants' compliance data. DLS found that "the reliability of the data underlying the reported measures tested was questionable with several being judged unreliable." S.J.A. 170. Following the DLS review, BCDSS began addressing a number of the reporting problems. Their subsequent reports showed several areas where the decree requirements were not being met.

Over the next few years, the number of available foster homes fell sharply. As a result, BCDSS began using its offices as emergency shelters. In 2005 Appellees became aware that Appellants were using an office building located on Gay Street in Baltimore as an overnight shelter. Appellees' investigation of this shelter revealed disturbing conditions, with children sleeping on the floor, unable to shower or change clothes, and subsisting on a diet of fast food. The investigation also revealed that some of the children with health problems were placed at risk by the precarious living conditions at the shelter.

In December 2005, Appellees informed Appellants that they intended to take action to address BCDSS's lack of compliance with the consent decree. In February 2006, Appellees

---

[2]In 1991 the parties modified the consent decree to extend its application to foster care cases in which children were placed with family members.

and Appellants began negotiations on potential changes to the decree which continued over the next year.

In March 2007, Brenda Donald was appointed as the new secretary of the Maryland Department of Human Resources and began implementing numerous reforms to the foster care system.[3] She also became involved in the consent decree negotiations, and agreed to a number of measures that would allow Appellees' counsel to monitor and assess the foster care system. However, she rejected Appellees' proposal to establish an independent monitor within the Governor's office to oversee the foster care system. This disagreement brought negotiations to a standstill. As a result, Appellees filed a memorandum with the district court detailing numerous allegations of Appellants' noncompliance with the 1988 decree. These included several examples of mistreatment of children in foster care as well as general allegations of inadequate health care and educational services.

---

[3]These reforms included the implementation of the "Place Matters" initiative, designed to reduce the number of children in out-of-home placements, increase the percentage of placement in family settings, and reduce the number of children in group homes. The initiative has resulted in significant advances toward those goals. Secretary Donald also ordered a case-by-case review of all children in BCDSS care, designed to identify barriers to permanent placements for each child.

Secretary Donald further implemented the "Baltimore Rebuild" program, designed to create substantial management capacity and leadership within BCDSS. As part of this initiative, she replaced the management team of BCDSS and appointed a new director, Molly McGrath. During McGrath's tenure, BCDSS has increased staff, reformed staff supervision, and created a number of new specialized senior staff positions, including medical director and educational director. Since 2007, BCDSS has also increased the use of a decision-making model that involves a foster child's family, made reforms in case-worker visits, and reduced the backlog of cases involving the termination of parental rights.

Although Appellants highlight the progress that has resulted from these reforms, they do not allege that such progress has rendered the decree unnecessary.

The district court scheduled a contempt hearing for September 2008. Five days before the hearing, Appellants filed a report admitting to numerous instances of noncompliance with the decree requirements, and stating: "the analysis provided in this report suggests several areas that need our urgent attention in the immediate future." J.A. 419. However, it expressed hope that the next report would "show measurable improvements in these critical areas." *Id.* During the subsequent contempt hearing, Appellants approached Appellees and offered to negotiate a "compliance and exit plan" that would "require verifiable data for the showing of compliance and exit." *Id.* at 479. The hearing was postponed pending such negotiations.

In June 2009, the parties reached a final agreement and jointly moved for judicial approval. The joint motion stated that the parties had "reached a comprehensive settlement of their current disputes regarding the existing Consent Decree and Modification that they believe is fair, reasonable, adequate, and in the best interest of the Plaintiff class." *Id.* at 634.

Shortly after a final agreement was reached, however, Appellants asked the court to allow briefing on the potential applicability of the Supreme Court's then-recent decision in *Horne v. Flores*, 129 S. Ct. 2579 (2009), which they alleged changed the law in a way that deprived the district court of subject matter jurisdiction to enforce the 1988 decree. The court held a hearing during which it preliminarily approved the 2009 decree, declaring it "not only fair" but also "commendable." J.A. 721. During the hearing Secretary Donald also described the decree as "very strong." *Id.* at 725. The court decided to permit briefing on the subject matter jurisdiction issue and stayed the final entry of the decree pending such briefing.

In September 2009, Appellants moved to vacate the 1988 decree under Federal Rule of Civil Procedure 60(b)(5), which states that a court may vacate a judgment or an order if: "the

judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Appellants' motion also opposed entry of the 2009 modified consent decree.

The motion alleged that, in *Horne*, the Supreme Court held that a court may not enforce a consent decree based on a statute that does not provide a private cause of action. They further alleged that *Horne* was directly applicable to this case because, in *Suter v. Artist M.*, 503 U.S. 347 (1992), the Supreme Court held that there was no private right of action under AACWA.

During the hearing on the motion to vacate, the district court first rejected Appellants' suggestion that the court lacked subject matter jurisdiction over the case. It stated that there was a "legitimate question" as to whether Appellees had a right of action under *Suter*, and that the "existence of a legitimate question confer[s] subject matter jurisdiction upon [the court]." J.A. 1212. Appellants then amended their jurisdictional argument, explaining:

> We're not saying the court lacks jurisdiction in the sense of the power to say what the law is. What we're saying is that the court under *Horne* lacks . . . the authority to order the relief requested. . . . You have the jurisdiction to decide the issue.

*Id.* at 1217-18.

The court rejected Appellants' interpretation of *Horne*. It instead read *Horne* as saying that "it is inappropriate for a federal court to grant relief in favor of the plaintiffs [if] in fact there is nothing in the record to suggest that there might be ongoing federal violations." *Id.* at 1225. The court further found that, because there remains a "concern about violations of federal law," there is "a continuing federal interest which

. . . is not inappropriate for [it] to continue to enforce even if these particular plaintiffs don't have a private right of action."[4] *Id.* The court denied the motion to vacate the 1988 decree and entered the 2009 decree. This appeal followed.

## II.

Appellants argue that the district court erred in denying their motion under Federal Rule of Civil Procedure 60(b)(5) to vacate the 1988 decree based on intervening changes in decisional law that allegedly eliminated the legal bases for the decree. They also argue that the district court erred in entering the 2009 modified consent decree, because it is not based on a valid federal claim. We address each contention in turn.

We review both the district court's denial of Appellants' Rule 60(b)(5) motion and its decision to enter the 2009 modified consent decree for abuse of discretion. *See United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999); *Werner v. Carbo*, 731 F.2d 204, 206 (4th Cir. 1984). A district court abuses its discretion only where it "has acted arbitrarily or irrationally[,] . . . has failed to consider judicially recognized factors constraining its exercise of discretion, or when it has relied on erroneous factual or legal premises." *United States v. Hedgepeth*, 418 F.3d 411, 419 (4th Cir. 2005) (internal citations and quotations omitted).

## A.

Rule 60(b)(5) provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment [or] order . . . [if] the judgment has been satisfied, released, or discharged; it is based on an earlier

---

[4]The court did not reach the question of whether Appellees had a private right of action under AACWA.

judgment that has been reversed or vacated; or applying it prospectively is no longer equitable.

A party seeking modification of a decree as "no longer equitable" has the "burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). A party "may meet its initial burden by showing either a significant change either in factual conditions or in law" that makes "enforcement of the decree . . . detrimental to the public interest." *Id.* at 384.

Appellants argue that they are entitled to relief under Rule 60(b)(5) because applying the consent degree prospectively is no longer equitable due to significant changes in decisional law created by *Horne* and *Suter*.[5] They allege that *Horne* "demonstrate[s] that the absence of a federal right enforceable through a private right of action deprives a federal court of authority to enter or enforce an injunction like the 1988 decree." Appellants' Br. at 25. They further assert that this change requires the court to vacate the decree because, under the Supreme Court's decision in *Suter*, "no private right of action is authorized by the statutes on which the plaintiffs base their claims." *Id.* They argue, as a result, that "no federal claim supports . . . the 1988 decree" and that the district court should therefore have vacated the decree. *Id.* at 30. For the reasons discussed below, we find that Appellants failed to meet their burden of showing that *Horne* and *Suter* created changes in the law that require vacatur of the 1988 decree.[6]

---

[5]Appellants have never alleged that the decree should be vacated because it has been fulfilled or because it is no longer necessary. In fact, in September 2009, the month they filed the motion to vacate, Appellants reported data that showed several ongoing compliance problems. However, the option of seeking to have the decree vacated on the basis of compliance remains available to Appellants, and we express no opinion in that regard.

[6]Appellants also argue that enforcement of the decree could not otherwise be based on alleged due process violations because "this Court did

1.

*Horne* involved a challenge to a declaratory judgment and related injunctions entered in an action alleging that an Arizona school district was providing inadequate instruction to English Language Learners ("ELL"). Plaintiffs in that action, a group of ELL students, asserted that the district's ELL program violated the Equal Educational Opportunities Act of 1974 ("EEOA"), 20 U.S.C. § 1703(f), which requires States to take "appropriate action to overcome language barriers" in schools. *Horne*, 129 S. Ct. at 2588. In granting declaratory judgment in favor of plaintiffs, the district court found an EEOA violation in the school district "because the amount of funding the State allocated for the special needs of ELL students (ELL incremental funding) was arbitrary and not related to the actual funding needed to cover the costs of ELL instruction." *Id.* at 2589. Six years after the judgment was entered, the Arizona state legislature passed H.B. 2064, designed to increase ELL funding. The Arizona Superintendent of Public Instruction, who was a defendant, along with state legislators who were permitted to intervene in the case, filed a Rule 60(b)(5) motion, alleging that H.B. 2064 created a change in circumstances that required vacatur of the original

---

not address those claims, and the 1988 decree was not based on them." Appellants' Br. at 7 n.8. Because we find that Appellants failed to show that the decrees lack a statutory basis, we need not address their claim that the decree was not based on Appellees' constitutional rights.

We note, however, that Appellants' argument before the district court that Appellees' complaint did not give rise to cognizable due process claims, which consisted of only one footnote in a reply brief, was insufficiently developed to establish that contention below. Furthermore, the footnote relied solely on cases that we have since held do not foreclose the existence of a constitutional right to protection for children in foster care. *See Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 174-75 (4th Cir. 2010) (distinguishing the cases cited by Appellants and holding that, under the Due Process Clause, states have "a duty not to make a foster care placement that is deliberately indifferent to the child's right to personal safety and security").

judgment. The district court denied the motion and the Ninth Circuit Court of Appeals affirmed.

The Supreme Court reversed, holding that both the district court and the Ninth Circuit had misapplied the Rule 60(b)(5) "changed circumstances" inquiry. The Court noted that Rule 60(b)(5) permits relief from a judgment in three circumstances: where "[i] the judgment has been satisfied, released or discharged; [ii] it is based on an earlier judgment that has been reversed or vacated; *or* [iii] applying it prospectively is no longer equitable." *Id.* at 2597 (alterations in the original). It held that both courts erroneously focused only on the first inquiry and failed to determine whether application of the judgment continued to be equitable. The opinion explained that the equity inquiry required the courts below to analyze "whether ongoing enforcement of the original order was supported by an ongoing violation of federal law," which they failed to do. *Id.* The Court then pointed to "important factual and legal changes that may warrant the granting of relief from the judgment" and remanded to the district court for "a proper examination" of changed circumstances. *Id.* at 2600.

The *Horne* opinion emphasized that the inquiry it described was required under the "flexible approach" to Rule 60(b)(5) that courts have been instructed to apply when reviewing institutional reform orders. Under that flexible approach, courts are directed to "ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Id.* at 2595 (quoting *Frew v. Hawkins*, 540 U.S. 431, 442 (2004)). Furthermore, the approach requires courts to "remain attentive to the fact that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.'" *Id.* (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)).

Appellants argue that the district court misapplied the flexible approach described in *Horne* by failing to vacate a decree

that was no longer equitable because it did not flow from a violation of federal rights. According to Appellants, the decree does not flow from a violation of federal rights because the statute on which it is based, AACWA, does not provide a private right of action. Appellants base their argument on a footnote in the *Horne* opinion, which states:

> [B]oth the District Court and the Court of Appeals held that HB 2064's funding mechanism violates [the No Child Left Behind Act of 2001 ("NCLB")]. . . . Whether or not HB 2064 violates [NCLB], . . . neither court below was empowered to decide the issue. As the Court of Appeals itself recognized, NCLB does not provide a private right of action. . . . "Without [statutory intent], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 286-287 (2001). Thus, NCLB is enforceable only by the agency charged with administering it.

*Id.* at 2598 n.6 ("Footnote 6") (internal citations omitted). Appellants argue that Footnote 6 announced the legal principle that the court is not "'empowered to decide the issue' of the violation of a federal statute or to order a remedy on that statute where . . . the statute 'does not provide a private cause of action.'" Appellants' Br. at 24. They claim that Footnote 6 established a significant change in decisional law sufficient to support vacatur under Rule 60(b)(5).

Because the judgment at issue in *Horne* was not based on alleged violations of NCLB, Footnote 6 did not relate to the validity of the judgment as a legal remedy. Rather, the footnote was a response to the holdings of the courts below concluding that, because the reforms in ELL funding through H.B. 2064 violated NCLB, those reforms could not render the judgment unnecessary. The footnote simply explained that

such a consideration was not appropriate because the courts could not entertain private allegations of noncompliance with NCLB and therefore could not decide that issue.

Although Appellants assert that Footnote 6 signifies a significant change in the law sufficient to support a Rule 60(b)(5) vacatur of the decree, neither Appellants' brief nor Appellants' counsel at oral argument could articulate the former state of the law that the *Horne* footnote allegedly changed. This is likely because the proposition explained in Footnote 6 is hardly novel. The Supreme Court has long held that private plaintiffs may not bring suits to enforce statutes that do not provide a private cause of action. In fact, the case cited in Footnote 6, *Alexander v. Sandoval*, 532 U.S. 275 (2001), stands for that very proposition by holding that a plaintiff cannot bring a disparate impact claim under § 602 of Title VI of the Civil Rights Act of 1964 because the Act does not provide a private right of action for such claim. *See also Gonzaga Univ. v. Doe*, 536 U.S. 273, 276 (2002) (holding that a private plaintiff may not being an action under the Family Educational Rights and Privacy Act of 1974 because that statute does not create personal rights to enforce under 42 U.S.C. § 1983). Footnote 6 simply explains that the courts below could not base their decisions on private allegations of noncompliance with NCLB because the private plaintiffs lacked a cause of action to bring a noncompliance challenge.

Appellants urge us to extend the narrow legal proposition contained in Footnote 6 to find that a court can retroactively lose authority to enforce a decree if that decree is based on a statute that the Supreme Court later finds not to provide a private cause of action. Given that Footnote 6 did not address either the actual statute upon which the judgment in the case was based or the court's continuing authority to enforce it, such a holding would require a significant logical leap unsupported by the footnote's sparse language. Accordingly, we find that *Horne* did not establish a change in the law sufficient to support Appellants' 60(b)(5) motion. At most, *Horne* rein-

forced the well-established principle that private plaintiffs cannot bring a claim to enforce a statute that lacks a private right of action.

2.

Furthermore, even if we were to accept Appellants' reading of Footnote 6, their argument would nonetheless remain unavailing for other reasons. Appellants allege that, under Footnote 6, the district court here lacks authority to enforce the decree because, pursuant to the Supreme Court's ruling in *Suter*, Appellees lack a private right of action to enforce AACWA. We first note that *Suter* was issued eighteen years ago. Rule 60(c) requires that a motion for relief under Rule 60(b)(5) be "made within a reasonable time." Therefore, even if *Suter* had indeed changed the law, Appellants' lengthy delay in filing a motion based upon it would bring into question the appropriateness of equitable relief.

Perhaps more importantly, Appellants have failed to meet the burden of showing that this court's decision in *L.J. II* has been overruled by *Suter*. Our holding in *L.J. II* that Appellees had a private right of action to enforce the relevant provisions of AACWA is "the law of the case" and is therefore presumptively controlling, absent proof to the contrary:

> The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. As a practical matter, then, once the decision of an appellate court establishes the law of the case, it must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal . . . unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision

was clearly erroneous and would work manifest injustice.

*TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) (internal quotations and citations omitted). Appellants appear to rely on the second prong of this analysis in arguing that *Suter* "made a contrary decision of law" by holding that AACWA is "unenforceable by foster children in a private right of action." Appellants' Br. 29. We decline to adopt Appellants' broad reading of *Suter*.

AACWA "establishes a federal reimbursement program for certain expenses incurred by the States in administering foster care and adoption services." *Suter*, 503 U.S. at 350-51. Under the Act, a state can be "reimbursed for a percentage of foster care and adoption assistance payments when the State satisfies the requirements of the Act." *Id.* at 351. *Suter* involved allegations that the Illinois Department of Children and Family Services had violated AACWA's requirements. The specific question before the Court was whether the Seventh Circuit Court of Appeals had erred in holding "that 42 U.S.C. § 671(a)(15) contained an implied right of action, and that [the plaintiffs] could enforce this section of the Act through an action brought under § 1983 as well." *Id.* at 350. *Suter* did not address the broader question of whether AACWA as a whole lacked a private right of action.

Section 671, as it existed at the time of *Suter*, stated in relevant part:

> (a) Requisite features of State plan[.] In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . (15) . . . provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home.

*Id.* at 351.[7] The *Suter* court found that, because there were no concrete requirements and no statutory guidance within the AACWA "as to how 'reasonable efforts' are to be measured," the section was too vague for private enforcement. *Suter*, 503 U.S. at 360. The Court also noted that the Act provided mechanisms for the Secretary of Health and Human Services to enforce the provision, and therefore "absence of a remedy to private plaintiffs under § 1983 does not make the 'reasonable efforts' clause a dead letter." *Id.* at 360-61. In addition, the Court found that although "the Act does place a requirement on the States, . . . that requirement only goes so far as to ensure that the State have a plan approved by the Secretary which contains the . . . listed features." *Id.* at 358.

Although not directly at issue in the case before it, the *Suter* Court also found in a footnote that the other provision on which the plaintiffs had originally based their complaint, 42 U.S.C. § 671(a)(9), lacked a private right of action. The court noted that the provision, which mandates reporting to the authorities of "unsuitable homes," "is merely another feature which the state plan must include to be approved by the Sec-

---

[7]The current language is slightly different, although the differences are not substantive. The current language states:

> In order for a State to be eligible for payments under this part [42 U.S.C. § 670 *et seq.*], it shall have a plan approved by the Secretary which . . .
>
> (15) provides that—
>
> (A) in determining reasonable efforts to be made with respect to a child, as described in this paragraph, and in making such reasonable efforts, the child's health and safety shall be the paramount concern;
>
> (B) except as provided in subparagraph (D), reasonable efforts shall be made to preserve and reunify families—(i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and (ii) to make it possible for a child to safely return to the child's home.

42 U.S.C. § 671.

retary" and "does not afford a cause of action to the respondents anymore than does the 'reasonable efforts' clause of § 671(a)(15)." *Suter*, 503 U.S. at 359 n.10.

Following the issuance of the *Suter* decision, Congress passed a law invalidating the Supreme Court's rationale relating to the existence of a state plan. The provision states, in part:

> In an action brought to enforce a provision of the Social Security Act [42 U.S.C. § 301 *et seq.*], such provision is not to be deemed unenforceable because of its inclusion in a section of the Act requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.*, 112 S. Ct. 1360 . . . [T]his section is not intended to alter the holding in *Suter v. Artist M.* that section 471(a)(15) of the Act [42 U.S.C. § 671(a)(15)] is not enforceable in a private right of action.

42 U.S.C. § 1320a-2. Therefore, although Congress did not overrule *Suter*, *see White by White v. Chambliss*, 112 F.3d 731, 739 n.4 (4th Cir. 1997), it made clear that the inclusion of a requirement as part of a state plan was not sufficient to render that requirement unenforceable by private action.

Appellants' argument that *Suter* stands for the proposition that no AACWA provisions are enforceable by a private party is unavailing. Whether a plaintiff has a right to bring an action under a particular provision of AACWA requires a section-specific inquiry. *See Blessing v. Freestone*, 520 U.S. 329, 342 (1997) ("[I]t is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined 'rights.' Only when the complaint is broken down into manageable

analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights."). The fact that *Suter* found no private right of action under § 671(a)(15) and § 671(a)(9) does not void our holding in *L.J. II* that the rights asserted by plaintiffs under § 671(a)(16) are privately enforceable under 42 U.S.C. § 1983.[8] *See L.J. II*, 838 F.2d at 123.

Section 671(a)(16) provides that the state:

> shall have a plan approved by the Secretary which . . . provides for the development of a case plan (as defined in . . . [42 U.S.C. § 675(1)]) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in . . . [42 U.S.C. § 675(5)(B)] with respect to each such child.

Sections 675(1) and 675(5)(B), in turn, provide concrete requirements for the content and timing of the case plans and case review systems.

Appellants argue that this "lone provision cannot support . . . the wide-ranging and prescriptive provisions of either the 1988 or the 2009 injunction." Appellants' Reply Br. 19. However, it is well established that "parties may agree to provisions in a consent decree which exceed the requirements of federal law." *Suter*, 503 U.S. at 354 n.6 (citing *Rufo*, 502 U.S. at 389). Appellants provide no legal support for the contention that a court cannot enforce a consent decree unless each and every statutory provision listed in the plaintiffs' complaint creates a private right of action. We therefore find their contention unpersuasive.

---

[8] *L.J. II* also relied on § 671(a)(10), which we have since held not to provide a private cause of action. *White by White v. Chambliss*, 112 F.3d 731, 739 (4th Cir. 1997). It further cited § 627(a)(2)(B), which is no longer part of the statute. Section 627(a)(2)(B) simply mirrored the case review requirement set out in § 671(a)(16).

Even under their own reading of *Horne*'s Footnote 6, Appellants have not shown that vacatur was required. They have failed to establish that *Suter* forecloses a private plaintiff's ability to bring an action pursuant to 42 U.S.C. § 671(a)(16).[9] Accordingly, we cannot say that the court abused its discretion in denying Appellants' motion to vacate the 1988 decree.[10]

## B.

Appellants also assert that the district court erred in entering the 2009 modified consent decree, to which they ultimately objected, because the decree lacked a valid legal basis.[11] Appellants argue that the changes created by *Suter* and *Horne* eliminated the statutory right of action upon which the 2009 consent decree was based.

---

[9]Appellants argue that we must reverse the district court's holding because it was based on the allegedly erroneous finding that, because there was "a continuing federal interest" in this case, it could "continue to enforce even if these particular plaintiffs don't have a private right of action." J.A. 1225. However, because we find that Appellants' failure to meet their burden on their Rule 60(b)(5) motion justifies the denial of the motion, we need not reach that finding. In affirming the holding of the district court, "[w]e are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record." *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (citation omitted).

[10]This holding does not, of course, foreclose the possibility that Appellants may file other Rule 60(b)(5) motions. As we noted earlier, for example, if in the future they wish to establish that the decree has been satisfied and is no longer necessary, that avenue remains open to them.

[11]We note that the fact that Appellants ultimately opposed the entry of the 2009 decree bears no significance for, as we have held "a party's change of heart regarding a settlement is not a valid basis upon which to refuse approval." *United States v. North Carolina*, 180 F.3d 574, 582 (4th Cir. 1999); *see also Petty v. Timken Corp.*, 849 F.2d 130, 133 (4th Cir. 1988) ("[S]econd thoughts . . . do[] not . . . establish unfairness or justify setting aside an otherwise valid [settlement] agreement.").

We have held that before entering a consent decree "the court must satisfy itself that the agreement 'is fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.'" *North Carolina*, 180 F.3d at 581. Here, Appellants made no objection to the fairness or reasonableness of the decree provisions themselves. Rather, they focused only on the legal basis of the claims upon which the decree rested. During the hearing on the merits of the decree, the court found that the decree "is not only fair, [but] commendable" and it "commend[ed] all sides for having worked to achieve it." J.A. 721. The court further noted that "but for the [*Horne*] subject matter jurisdiction issue, [it] certainly would approve the decree." *Id.*

Appellants do not now challenge the court's holding regarding the merits of the decree. Instead, they argue that the court abused its discretion by failing to "ensure that there [was] a substantial federal claim" supporting the decree. Appellants' Br. 26 (citing *Evans v. City of Chicago*, 10 F.3d 474, 479 (7th Cir. 1993)). As explained above, this court's holding that Appellees had a valid cause of action under AACWA is "the law of the case," and, as such, the district court is entitled to follow it absent proof that it has been overruled or that it is clearly erroneous. As we have previously discussed, Appellants failed to establish that the holding in *L.J. II* that 42 U.S.C. § 671(a)(16) provided a private cause of action was overruled by *Suter*. Nor did they establish below that the finding was clearly erroneous.

We have held that a prior decision does not qualify for the "clearly erroneous" exception to the "law of the case" doctrine "by being 'just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *Franchot*, 572 F.3d at 194 (citation omitted). In other words, it must be "dead wrong." *Id.* Here, Appellants failed to show that this court's previous conclusion that 42 U.S.C. § 671(a)(16) provided a private cause of action was "dead wrong." Indeed, in their briefing to the district court,

Appellants made no attempt to analyze the language of § 671(a)(16) to establish that it clearly did not create a private right of action. Had they done so, they would have had to contend with the fact that we have previously found a similar provision to create a private right of action.

In *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204 (4th Cir. 2007), we analyzed a statute that, like AACWA, required states to implement a state plan in order to receive federal funding. The plaintiffs in that case were rural health clinics that alleged that South Carolina's state Medicaid plan, which the state was required to implement in order to receive federal Medicaid reimbursements, failed to comply with federal requirements. In particular, they claimed violations of 42 U.S.C. § 1396a(bb), which states: "[T]he State plan shall provide for payment for services . . . furnished by a Federally-qualified health center and services . . . furnished by a rural health clinic in accordance with the provisions of this subsection."

The *Pee Dee* court first noted that, under *Blessing v. Freestone*:

> [a] statute creates an enforceable right if: (1) Congress intended that the provision in question benefit the plaintiff; (2) the right ostensibly protected by the statute 'is not so vague and amorphous that its enforcement would strain judicial competence'; and (3) the statute unambiguously imposes a binding obligation on the states.

*Pee Dee*, 509 F.3d at 210 (citing *Blessing*, 520 U.S. at 340-41). It then found that the section created a private right of action in the rural clinics because the words "shall provide for payment for services . . . furnished by a rural health clinic" showed that "Congress intended the statute to benefit" those clinics. *Id.* at 212. We also found that "the use of 'shall provide for payment' is not unduly vague or amorphous such that

the judiciary cannot enforce it." *Id.* Finally, the court found that "the language unambiguously binds the states as indicated by the repeated use of 'shall.'" *Id.*

Given our analysis in *Pee Dee*, we cannot say that this court's prior finding that § 671(a)(16) creates a private right of action is "dead wrong." The section dictates that a state

> *shall* have a plan approved by the Secretary which . . . provides for the development of a case plan (as defined in . . . [42 U.S.C. § 675(1)]) for *each child* receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section . . . [42 U.S.C. § 675(5)(B)] with respect to *each such child*.

42 U.S.C. § 671(a)(16) (emphasis added). This court's analysis in *Pee Dee* could arguably support a finding that the language of § 671(a)(16) clearly intends to benefit "each child" in foster care; that the plan and review requirements are not "so vague or amorphous" such that the judiciary could not enforce them; and that the "shall" language clearly binds the state. *See Pee Dee*, 509 F.3d at 210; *see also Blessing*, 520 U.S. at 340-41. Appellants have simply failed to show that such holding would be "dead wrong" under the *Blessing* framework.

To be clear, we do not now hold that § 671(a)(16) provides a private right of action. We simply hold that Appellants failed to show that the "law of the case" to that effect established by *L.J. II* was overruled or "dead wrong." Accordingly, Appellants cannot show that the district court abused its discretion by entering the 2009 decree, which was based on that provision.

### III.

For the reasons stated above, we

*AFFIRM*.